Kevin Ray ADKINS  *v.*  STATE of Arkansas

CR 06-1082                                    264 S.W.3d 523

Supreme Court of Arkansas
Opinion delivered October 4, 2007

*Butler, Green & Boyd, P.A.*, by: *Adam H. Butler*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant Kevin Adkins was convicted by a Benton County jury of aggravated assault on a correctional facility employee, possession of marijuana, and failure to register as a sex offender. The jury recommended sentences of fifteen years' imprisonment and a $10,000 fine for the failure-to-register conviction; fifteen years' imprisonment and a $10,000 fine for aggravated assault; and 30 years in prison and a $5,000 fine for the possession conviction. The trial court then sentenced Adkins to fifteen years for failure to register and thirty years for possession of marijuana, to run concurrently; the court also suspended imposition of sentence for the aggravated-assault conviction for fifteen years and ordered payment of a $10,000 fine.

On appeal, Adkins does not challenge his conviction for aggravated assault on an employee of a correctional facility. Instead, he argues that the trial court 1) should have granted his directed-verdict motion on the failure-to-register charge; 2) erred in allowing certain testimony during the sentencing phase of the trial; and 3) erred in allowing testimony about the state of Adkins's clothing at the time of his initial encounter with police.

In his first point on appeal, Adkins argues that the State failed to prove that he possessed a culpable mental state and thus failed to

meet its burden of proving all of the elements of the crime of failing to register as a sex offender under Ark. Code Ann. § 12-12-901 et seq. (Repl. 2003). For that reason, he urges that the trial court erred in denying his motion for directed verdict.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Saul v. State*, 365 Ark. 77, 225 S.W.3d 373 (2006); *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002). We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.*

Adkins argues on appeal that the State failed to prove that he violated the requirements of the Sex Offender Registration Act because it did not establish that he possessed the requisite mental state at the time of the alleged offense. Under the Act, a person who has been adjudicated guilty of a sex offense has a duty to register as a sex offender using a registration form prepared by the Arkansas Crime Information Center. *See* Ark. Code Ann. § 12-12-906 (Repl. 2003 & Supp. 2005); Ark. Code Ann. § 12-12-907 (Repl. 2003). The failure to register under the Act was, at the time of Adkins's arrest, a Class D felony. Ark. Code Ann. § 12-12-904(a)(1) (Repl. 2003).[1] Adkins does not deny that he was a sex offender who was required to register under the Act; rather, he urges that the Act is not a strict liability offense, and the State was therefore required to prove that he acted with a culpable mental state.

With some exceptions, when a statute defining an offense does not specifically delineate a culpable mental state, "a culpable mental state is nonetheless required and is established only if a person acts purposely, knowingly, or recklessly." Ark. Code Ann. § 5-2-203(b) (Repl. 2006). Those exceptions are found in Ark. Code Ann. § 5-2-204 (Repl. 2006), which provides, in pertinent part, as follows:

---

[1] Act 1743 of 2006 amended the classification of the offense to a Class C felony. *See* Ark. Code Ann. § 12-12-904(a)(1)(A)(i) (Supp. 2006).

(b) A person does not commit an offense unless he or she acts with a culpable mental state with respect to each element of the offense that requires a culpable mental state.

(c) However, a culpable mental state is not required if:

. . . .

(2) An *offense defined by a statute not a part of the Arkansas Criminal Code clearly indicates a legislative intent to dispense with any culpable mental state requirement* for the offense or for any element of the offense.

(Emphasis added.)

In the instant case, the Sex Offender Registration Act is not a part of the Arkansas Criminal Code; rather, it is located in Title 12 of the Code, which deals with "Law Enforcement, Emergency Management, and Military Affairs." Thus, under § 5-2-204(c)(2), a culpable mental state is not required if the offense "clearly indicates a legislative intent to dispense with any culpable mental state requirement for the offense or for any element of the offense."

Adkins argues that the Act is silent as to the requirement of a culpable mental state, and he relies on three cases — *State v. Setzer*, 302 Ark. 593, 791 S.W.2d 365 (1990); *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996); and *McDougal v. State*, 324 Ark. 354, 922 S.W.2d 323 (1996) — in support of his argument that this court should "graft" a mental-state requirement onto § 12-12-904. However, in each of those three cases, the crimes of which the defendants were accused were found in the Arkansas Criminal Code. Here, the crime of failing to register as a sex offender is not a part of the Criminal Code, and accordingly, Adkins's reliance on these cases as examples of instances in which this court will graft a *mens rea* requirement into a crime is inapposite.

More akin to the instant case is *Stivers v. State*, 354 Ark. 140, 118 S.W.3d 558 (2003), in which this court found a strict-liability offense in a violation of Ark. Code Ann. § 27-53-101 (Supp. 2003), which requires the driver of a vehicle involved in an accident resulting in injury to return to and remain at the scene of the accident. In *Stivers*, the defendant had asked the trial court to give a jury instruction that would have required the jury to find that the State had to prove that Stivers *knew* the accident victim had

been injured and *purposely* failed to stop his vehicle at the scene of the accident. *Stivers*, 354 Ark. at 144, 118 S.W.3d at 560-61 (emphasis in original). The trial court refused to give the requested instruction, and on appeal, Stivers argued that the trial court was statutorily required to graft a *mens rea* requirement onto § 27-53-101. *Id.*, 118 S.W.3d at 561.

This court rejected his argument, however, noting that the "language of the statute itself does not explicitly enunciate any particular mental state," but rather stated that the driver of a vehicle involved in an accident resulting in injury or death to any person "shall immediately stop the vehicle at the scene of the accident." *Id.* at 145-46, 118 S.W.3d at 562-63. Our court concluded that "[t]his mandatory language is a clear indication that the accident-causing driver's mental state is irrelevant." *Id.* at 146, 118 S.W.3d at 562.

In addition, the *Stivers* court noted that other statutes contained within the "Accidents" and "Accident Reports" chapters of Title 27 of the Arkansas code clearly set out the required mental states necessary before a person could be penalized for violating those statutes. *Id.* For example, the court cited Ark. Code Ann. § 27-53-201(b) (Supp. 2001), which provided that, "[f]or *willful* refusal to comply [with other associated statutes], the commissioner shall revoke the driver's license . . . of the person so convicted." *Id.* Our court then concluded as follows:

> Clearly, when the General Assembly desires to incorporate a *mens rea* element into the statutes governing traffic accidents, it can and, as seen in § 27-53-201(b), has done so. Here, the legislature clearly intended to dispense with any intent requirement in § 27-53-101. Therefore, the trial court did not err in declining to engraft an element of intent into the statute, or in refusing Stivers's proffered instruction.

*Id.*

In *Stivers*, there was a clear legislative intent to dispense with any *mens rea* requirement. Here, unless there is a clear legislative intent to dispense with any culpable mental state requirement for the offense of failing to register as a sex offender, "a culpable mental state is nonetheless required and is established only if a person acts purposely, knowingly, or recklessly" under § 5-2-203(b), because the Sex Offender Registration Act does not prescribe a culpable mental state. Accordingly, we must examine the Act itself.

As mentioned above, a person is "guilty of a Class [D] felony who . . . fails to register or verify registration as required under this subchapter." § 12-12-904(a)(1). The portions of the statute that set out an offender's duty to register are found in Ark. Code Ann. § 12-12-906, which provides as follows:

> (a)(1)(A) At the time of adjudication of guilt, the sentencing court shall enter on the judgment and commitment or judgment and disposition form whether or not the offender is required to register as a sex offender and shall indicate whether the offense is an aggravated sexual offense under § 12-12-903.
>
> (B) The Department of Correction shall ensure that a sex offender received for incarceration completes the sex offender registration form prepared by the Director of the Arkansas Crime Information Center pursuant to § 12-12-908.
>
> . . . .
>
> (b)(2) Immediately prior to the release of a sex offender . . . , the Department of Correction . . . shall update the registration file of the sex offender who is to be released . . . .

Ark. Code Ann. § 12-12-906 (Supp. 2005).[2]

Further subsections of the Act provide that, when registering or updating the registration file of a sex offender, the Department of Correction is required to inform the offender of the duty to submit to assessment and to register and obtain the information required for registration, Ark. Code Ann. § 12-12-906(c)(1)(A)(i); inform the offender of the need to advise the ACIC of any changes of address, § 12-12-906(c)(1)(A)(ii); inform the offender of the need to register in another state if the offender moves out of Arkansas, § 12-12-906(c)(1)(A)(iii); obtain fingerprints and a DNA sample, § 12-12-906(c)(1)(A)(iv) – (v); and require the sex offender to complete the entire registration process, "including, but not limited to, requiring the sex offender to read and sign a form stating that the duty of the sex offender to register under this subchapter has been explained." § 12-12-906(c)(1)(A)(vi).

---

[2] As mentioned above, the Act was amended in 2006 and now incorporates several new provisions; however, because the new language was not in effect at the time of Adkins's arrest, they do not apply to his situation.

Reading these provisions as a whole with the rest of the Act certainly indicates a legislative intent to place the burden of knowing the gravity of the situation, as well as the mandatory nature of the registration scheme, on the sex offender. As in *Stivers, supra,* although the General Assembly did not specifically spell out an intention to dispense with a *scienter* requirement, it is obvious that the registration requirements are mandatory, and that failure to comply with those duties is a strict liability offense.

Moreover, in *Kellar v. Fayetteville Police Department,* 339 Ark. 274, 5 S.W.3d 402 (1999), this court stated that "no *scienter* is indicated in Arkansas's Act, and we conclude the offender's failure to register alone is sufficient to trigger the Act's provisions." *Kellar,* 339 Ark. at 285, 5 S.W.3d at 409. *Kellar* was concerned with whether the Act violated the *ex post facto* provisions of the United States and Arkansas Constitutions. In making that determination, this court had to consider whether the Act was punitive in nature, or was merely regulatory. To that end, the *Kellar* court examined the seven factors set out in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144 (1963). Among those seven factors was whether the sanction imposed by the Act (the "sanction" in this case being the registration requirement itself) "comes into play only on a finding of *scienter.*" *Kellar,* 339 Ark. at 282, 5 S.W.3d at 407. Our court discussed the *scienter* factor as follows:

> The third factor in *Kennedy* concerns the *scienter* element. States have taken at least two approaches with this factor. Some recognize that *scienter* "comes into play when the offender is adjudicated guilty of the underlying offense." *Collie* [*v. State,*] 710 So. 2d [1000,] 1010 [(Fla. App. 1998)]; *see also* [*State v.*] *Manning,* 532 N.W.2d [244,] 247-48 [(Minn.App. 1995)] (because the registration requirement is dependent upon the conviction of an underlying crime, there will necessarily be a finding of *scienter*). *Other states hold that there is no element of scienter inherent in the registration statute, stating rather that the "offender need only be released into the community to trigger the provisions of these statutes."* [*State v.*] *Cook,* [83 Ohio St. 3d 404,] 700 N.E.2d [570,] 573; [*People v.*] *Logan,* 705 N.E.2d [152,] 159 [(Ill. 1998)]. *In our case, no scienter is indicated in Arkansas's Act, and we conclude the offender's failure to register alone is sufficient to trigger the Act's provisions. Accordingly, we hold this factor is not indicative of a punitive effect.*

*Kellar,* 339 Ark. at 285, 5 S.W.3d at 408-09 (emphasis added).

Combining these statements from *Kellar* with an analysis of the entire statutory scheme, we conclude that it is clear that failure to register is a strict liability offense. Because the State proved that Adkins was required to register but failed to do so, and because it was not required to prove that he failed to do so with any particular culpable mental state, the trial court did not err in denying Adkins's motion for directed verdict.

In his second argument on appeal, Adkins contends that the trial court erred by "allowing irrelevant highly prejudicial hearsay testimony during the sentencing phase" of Adkins's trial. A trial court's decision to admit evidence in the penalty phase of a trial is reviewed for an abuse of discretion. *Buckley v. State*, 349 Ark. 53, 76 S.W.3d 825 (2002). Pursuant to Ark. Code Ann. § 16-97-103 (Repl. 2006), certain evidence is admissible at sentencing that would not have been admissible at the guilt phase of the trial. *Crawford v. State*, 362 Ark. 301, 208 S.W.3d 146 (2005). Section 16-97-103 provides in pertinent part:

> Evidence relevant to sentencing by either the court or jury may include, but is not limited to, the following
>
> . . . .
>
> (5) Relevant character evidence;
>
> (6) Evidence of aggravating and mitigating circumstances. The criteria for departure from the sentencing standards may serve as examples of this type of evidence;
>
> (7) Evidence relevant to guilt presented in the first stage;
>
> (8) Evidence held inadmissible in the first stage may be resubmitted for consideration in the second stage if the basis for exclusion did not apply to sentencing; and
>
> (9) Rebuttal evidence.

While evidence introduced during the sentencing phase may include evidence described in this section, the list is not exhaustive. *Crawford v. State, supra.* However, the admissibility of proof in the penalty phase of a jury trial is governed by the Arkansas Rules of Evidence. *Hill v. State*, 318 Ark. 408, 887 S.W.2d 275 (1994). The *Hill* court also noted

that the State should not be precluded from introducing *relevant* evidence at a sentencing proceeding. *Id.* at 415, 887 S.W.2d at 278 (emphasis added).

Adkins argues that the testimony of three sentencing witnesses — Nancy Large, Kathy Taylor, and Corporal Keith Foster of the Rogers Police Department — constituted inadmissible hearsay evidence. Hearsay is defined by the Arkansas Rules of Evidence as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ark. R. Evid. 801. Even if hearsay is deemed relevant and admissible under one of the hearsay exceptions, *see* Ark. R. Evid. 803 & 804, it may nonetheless still be excluded under Ark. R. Evid. 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

As mentioned above, the challenged testimony came from Nancy Large and Kathy Taylor during the sentencing phase of Adkins's trial. Both women testified generally that they had seen Adkins "acting suspiciously" in the neighborhood park on the day of his initial contact with police. Large stated that her daughter came home from the park and said that there was "a man down there that was watching her" and who "kept her from going on the slide and freaked her out." Large also testified that she approached the man, who turned out to be Adkins, and asked him if he had a problem. She stated that she asked Adkins why he was talking to her daughter, and Adkins replied that he had asked the girl her name and that he knew a girl who lived down the street from him a few years ago.

Taylor stated that her daughter was also playing in the park that day; when Taylor went to the park, she saw a man sitting on the play equipment, and she gathered up her children and brought them home. Later, Taylor had a conversation with Large about the man in the park, and she called the police to report it.

Officer Foster testified that he came to be in the park because he had gotten a call from dispatch regarding a "suspicious incident of a person talking to kids in the park." Upon arriving at the park, Foster saw Adkins, who was the only person in the park, and confronted him. Adkins told Foster that he had asked a little girl her name because he thought he recognized her. On cross-

examination, Foster acknowledged that Adkins had said he was sorry if he caused any alarm, and that he had seemed sincere in that statement.

During the guilt phase of Adkins's trial, the trial court had deemed Large and Taylor's testimony inadmissible; however, during sentencing, the court allowed the testimony, informing the jury that the women's testimony was not being offered for the truth of the matter asserted, but instead to explain why Large and Taylor may have subsequently called the police. Regarding Foster's testimony, the court found that he could "testify as to what he saw, heard, or experienced. He can't testify as to what other people said to him."

On appeal, Adkins argues that the testimony of Large, Taylor, and Officer Foster was inadmissible hearsay that was not relevant for purposes of sentencing under Ark. Code Ann. § 16-97-103. He contends that the State introduced the testimony in an effort to inflame the jurors by suggesting that he was engaged in improper conduct for which he was not charged and had no real bearing on the issues in the case.

The State responds by asserting that the trial court correctly found that the statements were not hearsay, because they were not being offered for the truth of the matter asserted. This contention is correct; the trial court specifically instructed the jury that Large and Taylor's testimony was only to be considered to show why the women called the police.

However, even if the testimony was not hearsay, we must still determine whether it was admissible under Rule 403 — that is, whether its probative value was substantially outweighed by the danger of unfair prejudice. We conclude that this testimony was not unduly prejudicial. In *Crawford v. State, supra,* this court held that evidence of subsequent drug offenses, introduced during the sentencing phase of Crawford's trial for possession of drug paraphernalia with intent to manufacture, was relevant character evidence. Noting that character evidence that might not be admissible at the guilt phase could, under Ark. Code Ann. § 16-97-103(5), be admissible at sentencing, this court determined that evidence of Crawford's subsequent drug activity provided proof of his character and was relevant to the jury's determination of an appropriate punishment. *Crawford,* 362 Ark. at 306, 208 S.W.3d at 149. Similarly, we conclude that Large and Taylor's testimony

went to Adkins's character, and we cannot say that the trial court abused its discretion in admitting it.

Finally, Adkins challenges the trial court's decision to allow Officer Tom Helmich, of the Rogers Police Department, to testify that Adkins's pants were unbuttoned and unzipped at the time of his arrest. Adkins maintains that this evidence was irrelevant to the issue of whether he was guilty of the crimes of failure to register as a sex offender and possession of marijuana.

At trial, Officer Helmich testified that, on August 12, 2005, he and a police trainee were driving through the Maple Grove Park when they saw two men sitting on a park bench. Helmich and the other officer drove back by several other times, and the two men were still there, which "seemed odd" in light of some complaints of "some activity in the park." Helmich stated that he recognized Adkins and knew him to be a sex offender; Helmich also testified that he knew there "had been some issues with him failing to register." Helmich then contacted Adkins and also had dispatch check for any warrants on him for the registration issue.

At this point, Adkins objected and argued to the trial court that Helmich was going to testify that he saw Adkins's pants unbuttoned and unzipped, and that this testimony would be irrelevant and prejudicial. However, the court overruled Adkins's objection, and Helmich then proceeded to testify that, as he approached Adkins and Adkins stood up, Helmich noticed something bulging on the sides in front of him and wanted to make sure it wasn't a weapon. Helmich asked what it was, and Adkins replied that it was just his pants; Adkins lifted his shirt and revealed that his pants were unbuttoned and unzipped. Helmich was concerned as to why Adkins's pants were open, and Adkins said that his pants were too tight, so he unbuttoned them. Helmich also asked if Adkins had anything illegal on him, to which Adkins said he did not. Helmich then searched Adkins and discovered a marijuana cigarette in his pocket.

On appeal, Adkins argues that this testimony was unduly prejudicial because it "suggest[ed] he was engaged in improper sexual conduct for which he was not charged, and had no real bearing on the ultimate issues in the case." However, Adkins cured any potential prejudice when he cross-examined Helmich. On that cross-examination, Helmich stated that, although Adkins's pants were unbuttoned, he did not observe Adkins "doing anything sexual" with the other man on the bench, and he did not

observe "any activity . . . that was of a sexual nature" or see Adkins "doing anything sexual to himself." Helmich stated that, "[w]hen he stood up, his pants were unbuttoned, and his explanation was they were too tight; he was sitting down and he had them unbuttoned."

■ Moreover, as the State suggests, the appearance of Adkins's clothing was relevant to why Helmich searched him in the first place. As mentioned above, Helmich noticed a bulge in Adkins's clothing and wanted to make sure Adkins was not carrying a weapon. Because Adkins's appearance was part of the reason Helmich decided to search him, the state of his clothing was arguably relevant to the issue at hand.