ARKANSAS STATE BOARD of NURSING *v.*
Jody Marie MORRISON

CA 03-1291                                      197 S.W.3d 16

Court of Appeals of Arkansas
Opinion delivered November 3, 2004

[Rehearing denied December 8, 2004.]

*William F. Knight,* for appellant.

*Ledbetter, Cogbill, Arnold & Harrison, L.L.P.,* by: *R. Ray Fulmer, II,* for appellee.

JOSEPHINE LINKER HART, Judge. This is an appeal from the Sebastian County Circuit Court reversing the decision of appellant Arkansas State Board of Nursing (Board) in a disciplinary action. The Board argues that the trial court erred in reversing its decision on judicial review. We affirm the trial court and reverse the Board.

Appellee Jody Morrison was licensed as an advanced practice nurse (APN) and registered nurse in Arkansas after she was first licensed as an APN in Kansas in 1994. An APN is a nurse who has gained additional knowledge and skills through successful completion of an organized program of nursing education that certifies nurses for advanced practice roles as advanced nurse practitioners and requires national certification. *See* Ark. Code Ann. § 17-87-102(3) (Repl. 2002). An APN may be granted authority to prescribe drugs and medications under certain conditions. *See* Ark. Code Ann. § 17-87-310 (Repl. 2002). In order to obtain prescriptive authority, an APN must have a collaborative practice agreement (CPA or agreement) that outlines the procedures for consultation with a physician in the joint management of the needs of the APN's patients. *See* Ark. Code Ann. §§ 17-87-102(2), 17-87-310(a)(2) (Repl. 2002).

On January 23, 2003, the Board sent appellee notice of a hearing to determine whether she had violated Ark. Code Ann. § 17-87-309(a)(6) (Repl. 2002) by engaging in "unprofessional conduct." The Board's regulations defines the term "unprofessional conduct" as that conduct

> which, in the opinion of the Board, is likely to deceive, defraud, or injure patients or the public, means any act, practice, or omission that fails to conform to the accepted standards of the nursing

profession and which results from conscious disregard for the health and welfare of the public and of the patient under the nurse's care. . . .

Arkansas State Board of Nursing, Rules and Regulations, Ch. 7, § XV(a)(6) (hereafter "Regulations").[1] The factual basis to support the Board's charge was an allegation that appellee had admitted writing prescriptions without authority from May 16, 2002, until November 2002.

At a hearing before the Board, Georgia Lewis, the Board's director of advanced nursing practice, described the contents of her investigative file. She testified that appellee was licensed as a registered nurse in Arkansas by endorsement from Kansas on February 12, 2002, and that her Arkansas APN license by application was issued on February 15, 2002. She noted that appellee held licenses in Missouri and Maine, in addition to Kansas, with no disciplinary action noted. The Board received appellee's CPA with her prospective employer, Neurosurgical Associates, on February 7, 2002. On February 15, the Board received a letter from Neurosurgical Associates, stating that appellee would not be employed by them and that the CPA was null and void. Lewis testified that, after receiving the letter from Neurosurgical Associates, she communicated several times with appellee who, according to Lewis, said that she probably would not pursue getting a certificate of prescriptive authority. Lewis stated that, on November 19, 2002, her assistant, Pam Beggs, called appellee to remind her that her application would soon expire. She stated that the file showed that appellee told Beggs that she had been prescribing medicine in Arkansas.

Lewis testified that, following appellee's disclosure of her writing prescriptions, she wrote a letter to appellee informing her that she did not have prescriptive authority and directing appellee to immediately cease prescribing medications. Lewis stated that the Board received a letter in which appellee explained that she had been prescribing an occasional Xanax and cholesterol medications, together with some other drugs, and that, to her knowledge, she had never prescribed a Schedule II drug. In the letter, appellee also stated that her Drug Enforcement Administration (DEA) registration was up to date. In addition, appellee also wrote that, to the

---

[1] That section then goes on to list nineteen non-exhaustive examples of "unprofessional conduct."

best of her knowledge, all of her paper work had been submitted to the Board. The Board received a CPA on November 21, 2002, that, according to Lewis, did not comply with the Board's regulations concerning the contents of such agreements.

On December 4, 2002, the Board received a letter from appellee's employer, Dr. Kurt Mehl, of Cooper Clinic, stating appellee's employment dates and the types of medication that she had been prescribing. Lewis testified that the letter stated "[u]nfortunately, [appellee] was unaware that prescriptive authority number was needed to be written on her prescriptions. She has clearly written her DEA number on the prescriptions that she has written from our office." Lewis further stated that Mehl's letter indicated that it was the understanding of everyone at Cooper Clinic, including appellee, that all necessary paperwork had been completed and properly sent to the Board.

Lewis acknowledged that appellee had submitted a new CPA that complied with the Board's rules. Lewis further testified that the Board had also received a letter from Steve Brown, the director of human resources for Cooper Clinic, stating that the original CPA between appellee and Dr. Mehl dated July 12, 2002, had been sent at an earlier date. She also testified that, during an earlier conference call, appellee informed the Board's attorney and herself that a CPA had not been sent. Lewis stated that she contacted the DEA in November and was informed that appellee's relocation registration with DEA had occurred in September 2002. On cross-examination, Lewis admitted that she did not recall making notes during the conference call.

Lewis opined that prescriptive authority could not be given at the time appellee's APN license was issued because there was no CPA due to Neurosurgical Associates' canceling the agreement. She stated that appellee never contacted the Board to see if it had received her CPA or if everything was in order. She also stated that appellee never asked about the scope of her prescriptive authority.

Appellee testified that she was a nurse practitioner at Cooper Clinic and that she has prescriptive authority. Appellee stated that she is supervised by three physicians on the cardiology floor at the clinic and that the physicians periodically review by random selection files on patients with whom she has worked. She stated that there has never been a time while practicing at Cooper Clinic when she did not have a physician available to her. Appellee stated that, in preparation of her moving to Arkansas, she became

national-board certified by taking a certification test and passing in December 2001. After she passed the test, she began the process of applying for a license in Arkansas. She stated that Neurosurgical Associates was somewhat concerned with the language of the proposed CPA, but the agreement was sent to the Board on January 28, 2002. She stated that, prior to beginning work with Neurosurgical Associates, there was some misunderstanding as to whether her license in Kansas had been inactivated because of a disciplinary action. Appellee testified that it was not. She stated that on February 13, 2002, Neurosurgical Associates withdrew its offer of employment.

After the offer was withdrawn, appellee continued to look for employment in Arkansas and contacted Cooper Clinic. Appellee testified that she had called Mrs. Lewis to inquire about the status of her license. During appellee's interview with Cooper Clinic, she was asked about the status of her Arkansas license and she informed them that she would need a CPA. According to her, the clinic administrative personnel indicated that they were familiar with the licensing process and would assist in the preparation of the agreement. Appellee stated that her change of address form with the DEA was effective July 17, 2002, but that it takes approximately six to eight weeks to receive paperwork acknowledging the change.

Appellee stated that she signed the first CPA with Cooper Clinic on May 15, 2002, the day before she commenced her employment. She also stated that she never functioned independently at the clinic but that there were times when she met with patients without the presence of a doctor. She described her first couple of months as becoming familiar with a new area of practice for her and said she spent her time reading materials that the doctors asked her to learn.

Appellee stated that she first realized that there was a problem with her prescriptive authority on November 20, 2002, when she received a phone call from Pam Beggs. She stated that she ceased prescribing medications when she was told to do so by Georgia Lewis and that she had not prescribed any medication since. She also stated that she was not aware of the separate requirements for prescriptive authority because, in Kansas, prescriptive authority is part of advanced practice licensure. Appellee stated that Kansas does require CPAs but that they are not required to be filed with the Kansas board. She stated that she believed that she was in compliance because Cooper Clinic had forwarded a

CPA to the Board but that she also now realized that the original agreement she executed with the clinic was never filed with the Board.

Appellee denied Lewis's statement that she would not pursue a certificate of prescriptive authority. Appellee also stated that Lewis informed her that all she needed to do was send in a CPA from her new employer. She admitted that she did not contact Mrs. Lewis until being contacted by Pam Beggs. She stated that she did not know the exact date she starting prescribing medications but believed that it was the end of July or early August, when Cooper Clinic moved into a new building. She stated that she did not realize it was a separate application process because she filled out a packet of information and sent it to the Board, together with several checks. She admitted that she did not send a properly completed CPA with Cooper Clinic until November or December 2002. Appellee admitted that she did, in fact, write prescriptions without authority to do so but that she did not know that she lacked authority at the time she was writing the prescriptions.

Dr. Riley Foreman, a cardiologist at Cooper Clinic, testified as to appellee's competence and professionalism and stated that he had not observed any conduct on appellee's part that negatively impacted on patient care. Dr. Timothy Waack, a cardiologist and the medical director at Cooper Clinic, testified that appellee was an excellent practitioner and that appellee serves the public well. He also stated that part of the clinic's administrative function is to assist the practitioner in licensing and credentialing. He did admit that it is ultimately the professional's responsibility to obtain the necessary licensure.

Steve Brown, Cooper Clinic's director of human resources, testified that appellee advised the clinic of her need for a CPA, that the clinic was familiar with such agreements, that appellee signed an agreement before beginning work at the clinic, and that he advised appellee that he would obtain the necessary physicians' signatures and file the agreement with the Board. He stated that the agreement was not filed with the Board but that he believed that it had been. He stated that the original agreement had been misplaced in a hanging folder containing appellee's file. He admitted that he made a mistake by not sending the original agreement to the Board.

The Board found that appellee admitted that she had written prescriptions between May 16, 2002, and November 2002 and concluded that appellee was guilty of "unprofessional conduct."

The Board imposed a $1,000 civil penalty on appellee, placed appellee's license on six months' probation, and ordered appellee to complete a Legal and Ethical Issues course. The Board imposed several conditions of probation, including that appellee present each future employer with a copy of the Board's order; that appellee and her employer must submit quarterly reports concerning appellee's safe practice of nursing; and that appellee not practice nursing outside the State of Arkansas without the written permission of the Board and of the appropriate board in the state in which appellee seeks to practice.

Appellee then sought judicial review in circuit court, alleging that the Board's finding that she was guilty of "unprofessional conduct" was not supported by substantial evidence because the Board failed to produce evidence as to each element necessary to support such a finding of "unprofessional conduct." The circuit court reversed the Board, finding that the Board's decision was not supported by substantial evidence because there was no proof as to the accepted standards of the nursing profession or that appellee's failure to obtain prescriptive authority was a result of her "conscious disregard for the health and welfare of the public and of the patient under the nurse's care." This appeal followed.

For reversal, the Board specifically argues that there was substantial evidence to support its decision; that the decision was within the scope of its statutory authority; and that the decision was not arbitrary, capricious, or an abuse of its discretion.

■ Our review is directed not toward the circuit court, but toward the decision of the agency. *Arkansas State Police Comm'n v. Smith*, 338 Ark. 354, 994 S.W.2d 456 (1999). It is often stated that administrative agencies are better equipped by specialization than courts to determine and analyze legal issues affecting their agencies. *McQuay v. Arkansas State Bd. of Architects*, 337 Ark. 339, 989 S.W.2d 499 (1999); *Social Work Licensing Bd. v. Moncebaiz*, 332 Ark. 67, 962 S.W.2d 797 (1998). Administrative agencies' decisions will be upheld if they are supported by substantial evidence and are not arbitrary, capricious, or characterized by an abuse of discretion. *McQuay, supra*; *Wright v. Arkansas State Plant Bd.*, 311 Ark. 125, 842 S.W.2d 42 (1992).

■ In determining whether a decision is supported by substantial evidence, we review the record to ascertain if the decision is supported by relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Arkansas Bd. of*

*Exam'rs v. Carlson*, 334 Ark. 614, 976 S.W.2d 934 (1998). In doing so, we give the evidence its strongest probative force in favor of the administrative agency. *Id.* The question is not whether the testimony would have supported a contrary finding, but whether it supports the finding that was made. *Id.*

■ The Board argues that there was substantial evidence to support the finding that appellee wrote prescriptions without proper authority and, therefore, it was error for the trial court to reverse its decision imposing discipline on appellee. Noting that appellee admitted to writing prescriptions without authority, the Board argues that this admission is sufficient evidence to support its decision. In our view, the Board's analysis does not go far enough. Appellee was not simply charged with writing prescriptions without proper authority; she was charged with "unprofessional conduct." Because of the language used to define "unprofessional conduct," the Board must prove both an act or omission on appellee's part that fell below the standard of care of the nursing profession **and** that such act or omission was the result of a "conscious disregard for the health and welfare of the public and of the patient under the nurse's care. . . ." Regulations, Ch. 7, § XV(a)(6). Appellee's admission was just the first prong necessary to support the Board's decision. The second prong is that there must be evidence to show that appellee's admitted actions fell below the standard of care and "which results from conscious disregard for the health and welfare of the public and of the patient under the nurse's care. . . ." There is no evidence in this record showing that appellee's actions were the result of a "conscious disregard of the health and safety of the public."

■ Arkansas case law contains many cases requiring expert testimony on the standard of care in professional discipline cases where the applicable rules or regulations define professional misconduct as falling below certain standards. In *Hake v. Arkansas State Medical Board*, 237 Ark. 506, 374 S.W.2d 173 (1964), the supreme court first addressed the issue of whether expert testimony is required to establish the standard of care against which a professional is judged by a professional licensing board. There, Dr. Hake appealed an order by the Arkansas State Medical Board revoking his license to practice medicine. Dr. Hake argued that the board's decision was not supported by any competent evidence because

"the findings and opinion of the board [were] based on testimony or conversation or other matters which arose or were presented at [an] informal and unreported hearing." 237 Ark. at 510, 374 S.W.2d at 176. The court agreed and reversed the revocation on the grounds that "there [was] a virtual absence of evidence in the record to sustain the board's findings, as well as no expert testimony to provide a standard for the board's medical opinions." *Id.*[2]

■ *Hollabaugh v. Arkansas State Medical Board*, 43 Ark. App. 83, 861 S.W.2d 317 (1993), involved discipline of a physician. The Arkansas State Medical Board placed Dr. Hollabaugh on probation and directed her to refrain from writing certain narcotics prescriptions, and the circuit court affirmed this decision. This court reversed the circuit court, determining that there was not substantial evidence to support the board's decision, stating:

> There is a virtual absence of evidence in the record to sustain the board's findings, as well as no expert testimony to provide a standard for the board's medical opinions. The valuable property rights here involved cannot be taken from appellant upon such questionable compliance with due process.

*Hollabaugh*, 43 Ark. App. at 87, 861 S.W.2d at 319 (citing *Hake*). This court then held that the record must contain expert testimony establishing the standard of care to which Dr. Hollabaugh is to be held and whether she violated that standard and that, without such evidence, this court could not affirm the decision of the board.

■ The Board attempts to distinguish *Hollabaugh* and *Hake*, arguing that they involve doctors who admitted to over-prescribing medications, while the present case is a licensing case. We do not believe this to be a valid distinction. All three cases involve disciplinary actions. *Hake* involved the revocation of a

---

[2] In *Finch v. Neal*, 316 Ark. 530, 873 S.W.2d 519 (1994), an attorney disciplinary proceeding, the supreme court clarified its holding in *Hake*. The attorney, citing *Hake*, argued that the reprimand issued to him should be reversed because there was no expert testimony regarding the standard against which to measure his conduct. The supreme court explained that the board's decision was overturned in *Hake* because the board had not complied with the statutory requirement that all evidence considered by the board be included in the official record of the proceedings. The board in *Hake* had relied on conversations and evidence from an earlier, unofficial, unreported meeting with the doctor.

medical license, while *Hollabaugh* and the present case involve placing the professional on probation. The present case is not one where the Board is denying appellee a license in the first instance because Georgia Lewis admitted that appellee's RN license was issued on February 12, 2002, and her APN license was issued on February 15, 2002. The present case involves discipline to one already licensed in the profession.

In *Livingston v. Arkansas State Medical Board*, 288 Ark. 1, 701 S.W.2d 361 (1986), the supreme court affirmed the medical board's finding that Dr. Livingston had committed "grossly negligent or ignorant malpractice" warranting the suspension of her license to practice medicine for thirty days. The court noted that "malpractice" is defined by the medical board's regulations to include "any professional misconduct, unreasonable lack of skill or fidelity in professional duties, evil practice, or illegal or immoral conduct in the practice of medicine and surgery." 288 Ark. at 5, 701 S.W.2d at 363. In *Livingston,* there was expert testimony that Dr. Livingston's actions had breached the ordinary standard of care in the community.

These cases, together with such cases as *Arkansas Department of Human Services v. Haen,* 81 Ark. App. 171, 100 S.W.3d 740 (2003), show that an administrative agency must make findings on the issue of intent when the applicable statute or regulation so requires. In the present case, the Board argues that appellee conceded that she was guilty of an act or omission falling below the standard of care. However, at the time, appellee's counsel was making a motion to dismiss in the nature of a directed-verdict motion, arguing that the Board had not met its burden of proving every element of the charge of "unprofessional conduct" because there was no proof of the standard of care or proof of intent and that both elements were necessary in order to prove the charge. In this context, we believe that appellee was conceding only the act or omission, not that it fell below the standard of care or that it was done with the requisite intent. Even if this statement could be characterized as an admission that her act or omission violated the standard of care, there still must be evidence regarding whether appellee's action was the "result of a conscious disregard of the health and safety of the public or the patient. . . ." There is no substantial evidence regarding the standard of care or regarding appellee's intent. As such, the Board's

decision was made in excess of its statutory authority, and the circuit court was correct to reverse the Board.

Affirmed.

BIRD and BAKER, JJ., agree.