## ARKANSAS DEPARTMENT of CORRECTION SEX OFFENDER SCREENING & RISK ASSESSMENT *v.* Robert J. CLAYBAUGH Jr.

CA 05-427                                                 216 S.W.3d 134

### Court of Appeals of Arkansas
### Opinion delivered October 26, 2005

*Mike Beebe*, Arkansas Attorney General, by: *Eric F. Walker*, Assistant Attorney General, and *Amy L. Ford*, Assistant Attorney General, for appellant.

*Ronald W. Metcalf*, for appellee.

SAM BIRD, Judge. This case involves the risk level assigned to appellee Robert J. Claybaugh Jr. under the Sex Offender Registration Act of 1997, which was enacted by the General Assembly for the express purpose of protecting the public from sex offenders and assisting law enforcement in so protecting the public safety. Ark. Code Ann. § 12-12-902 (Repl. 2003); *Kellar v. Fayetteville Police Dep't*, 339 Ark. 274, 5 S.W.3d 402 (1999). The Act specifies that individuals convicted of particular sex offenses must register with the

State as sex offenders and must submit to an assessment of the risk that they pose to the public. Ark. Code Ann. § 12-12-917 (Spec. Supp. 2003-2004).[1]

Appellant Sex Offender Screening and Risk Assessment (SOSRA), a unit of the Sex Offender Assessment Committee (Committee), brings this appeal from the Sebastian County Circuit Court's order of January 3, 2005, which reduced the risk assessment that the Committee had assigned to Claybaugh from Level 3 to Level 1. SOSRA contends that the Committee's decision was supported by substantial evidence, was not based upon unlawful procedure, and was not arbitrary and capricious. We do not agree. The decision of the Committee is reversed, and the decision of the trial court is affirmed.

On June 3, 2002, Claybaugh pled no contest to the charge of second-degree violation of a minor, based upon allegations that he rubbed his fourteen-or-fifteen-year-old daughter with a vibrator on her vagina on top of her clothing while she was sleeping. He was found guilty, was sentenced to seventy-two months in the Arkansas Department of Correction, and was incarcerated. He was released on parole, and on September 17, 2003, he presented himself to the Sex Offender Assessment Committee for sex-offender risk assessment.

Guidelines and procedures for public disclosure of information about sex offenders that are necessary for public protection are developed by the Sex Offenders Assessment Committee. Those guidelines "identify factors relevant to a sex offender's future dangerousness and likelihood of reoffense or threat to the community" and determine public notification according to the risk level that an offender is assigned after undergoing the assessment process. *See* Ark. Code Ann. § 12-12-913.[2]

---

[1] The Sex Offender Registration Act, codified at Ark. Code Ann. §§ 12-12-901 *et seq.*, was last amended by Act 1962 of 2005. We refer in this opinion to provisions of the statute as amended by Act 21 of 2003.

[2] Under Ark. Code Ann. § 12-12-913(j)(1)(A) (Spec. Supp. 2003-2004), the following information is to be made public concerning a Level 3 or Level 4 registered sex offender:

(i) The sex offender's complete name, as well as any aliases;

(ii) The sex offender's date of birth;

In the present case, a "risk assessment and offender profile report" signed by George K. Simon Jr., Ph.D., included the following summary of Claybaugh's assessment interview:

> This offender was interviewed on 9-17-03 by Diane Gray, Correctional Counselor. He was extremely uncooperative and incomprehensively evasive when questioned. George K. Simon, Ph.D. was also present for a portion of the interview and advised the offender about the lack of need for and the possible consequences of his refusal to cooperate. The offender continued to make implausible assertions and to refuse to answer questions in a straightforward manner. His refusal to cooperate reached a point that the interview had to be terminated.

The report found that Claybaugh's "extreme uncooperativeness in the face of a relatively minor sex offense of record suggests his sexual deviancy and offense history as well as his antisociality may be greater than the official conviction record suggests." Although noting the low risk given Claybaugh under the Vermont Assessment of Sexual Offense Risk (VASOR) Composite Risk, the report assessed Claybaugh at Level 3 by default "because he refused to comply or cooperate with Risk Assessment procedures."

Claybaugh filed an administrative appeal of his risk classification to SOSRA, which appointed a member of the Sex Offender Assessment Committee to conduct the review. The written review included the following findings:

---

(iii) The sexual offense or offenses to which the sex offender has pleaded guilty or nolo contendere or of which the sex offender has been found guilty by a court of competent jurisdiction;

(iv) The street name and block number, county, city, and zip code where the sex offender resides;

(v) The sex offender's race and gender;

(vi) The date of the last address verification of the sex offender provided to the center;

(vii) The most recent photograph of the sex offender that has been submitted to the center; and

(viii) The sex offender's parole or probation office.

> Mr. Claybaugh did not have to admit guilt, he did have to be honest as to his state of mind, intent and actions. I have listened to the tape and though he tries to come across as credible, I do not find him so. It is the policy of the Sex Offender Assessment Committee that if the individual is not open and honest during the assessment he/she cannot be adequately assessed.

Thereupon, the Committee found no reason to change the risk level from the default Level 3 that had been assigned.

Claybaugh appealed the Committee's ruling to the Sebastian County Circuit Court, essentially asserting that substantial evidence did not support the agency decision. A hearing was conducted before the trial court on December 20, 2004. The record of the hearing includes these comments by the court:

> I have been talking to the attorneys in chambers. I have reviewed the file and part of the record that was submitted. I haven't had a chance yet to review it all. Let me tell you what I had actually determined and then these attorneys can see if that is what we actually decided. I told the attorneys that based on my review of the file and the partial review of the record, level 3 seemed an inappropriate level to me. It seemed too high, but I didn't know what provisions there were. Mr. Walker indicated that the Committee was meeting today and that they could take this matter up and vote today. If they voted to leave it at a level 3, then what I propose to do is, well, I propose to suspend this hearing today. If the Committee votes to leave it at level 3, there is no need to have the attorneys or Dr. Mobley come back. I will review the file and the complete record and make a written order either saying it should stay level 3, it should be lowered to level 2 or level 1.

> If the Committee lowers it from level 3, then Mr. Metcalf [defense counsel] has agreed to be satisfied with the lower level and there would be an order entered. I guess, Mr. Walker, you would prepare it basically stating that, that the Committee has reduced it to a level whatever and that's it.

The parties, after agreeing to suspension of the hearing so that a compromise settlement proposal could be presented to the Sex Offender Assessment Committee the same day, submitted their statements to the trial court and introduced exhibits into evidence in the event that the Committee did not change the level. The Committee met and, rather than accept the parties' proposed compromise, let the Level 3 classification stand. The trial court then reviewed the case.

The evidence before the trial court included a consent/refusal/disclosure form bearing Claybaugh's signature; the Committee's 2002 guidelines for assessment, registration, and notification; pertinent statutes; and audio tapes. The form that Claybaugh signed stated that an assessment "is based primarily on documented information" as opposed to the examiner's opinions, but that Level 3 would be assigned if the offender should "withhold information, give false information or seriously compromise the assessment team's ability to do a fair and accurate assessment." Similarly, the 2002 guidelines state that a high-risk classification will be given to individuals "who attempt to conceal or lie about their behavioral histories." The State informed the trial court that 2002 regulations allowed an increased risk for an offender "deemed to have provided deliberately false or misleading information to the assessment team" and that later regulations, adopted in June of 2004, attempted to clarify "false or deliberate" as follows:

> It is important that the person being interviewed answer the questions openly and honestly. If the answers do not match up with the documents previously obtained, the interviewer may conclude that the individual is withholding information or being deceptive.

Also in evidence was a copy of Ark. Code Ann. § 12-12-917(b)(4)(B)(ii)(a) (Spec. Supp. 2003–2004), which reads in part:

> If a sex offender fails to appear, is shown by substantial evidence to have been deceptive, or voluntarily terminates the assessment process after having been advised of the potential consequences:
>
> (1) The sex offender shall be classified in risk level 3; and
>
> (2) The parole or probation officer, if applicable, shall be notified.

Finally, the State introduced into evidence cassette tapes and the transcript of Claybaugh's assessment interview.

In its order of January 3, 2005, the trial court stated that it had listened to the tapes and reviewed the entire record. The court's order included the following:

> The actual testing results indicate a Level 1, low risk assessment, which is consistent with the criminal history. Petitioner [Clay-

baugh] did not voluntarily terminate the interview process, which lasted over one hour. Petitioner was cooperative throughout the examination and was compliant with the general instructions and requests for information. There is not substantial evidence that he was deceptive after having been warned of the possible consequences of being rated Level 3 by default.

Ruling that the default Level 3 classification was not supported by substantial evidence, was arbitrary and capricious, and was made upon unlawful procedure, the court modified the classification of Level 3 to Level 1.

The appeal arises from the trial court's order. We now turn to the point on appeal that appellant SOSRA has presented to us.

*Whether SOSRA's Level 3 classification of Claybaugh is not supported by substantial evidence, is based upon unlawful procedure, and is arbitrary and capricious*

The Arkansas Administrative Procedure Act provides that the agency decision may be reversed if the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the agency's statutory authority;

(3) Made upon unlawful procedure;

(4) Affected by other error or law;

(5) Not supported by substantial evidence of record; or

(6) Arbitrary, capricious, or characterized by abuse of discretion.

Ark. Code Ann. § 25-15-212(h) (Repl. 2002).

The appellate court's review is directed not toward the circuit court, but toward the decision of the agency. *Holloway v. Arkansas State Bd. of Architects*, 352 Ark. 427, 101 S.W.3d 805 (2003). When reviewing administrative decisions, the court reviews the entire record to determine whether any substantial evidence supports the agency's decision. *Arkansas Bd. of Registration*

*for Professional Geologists v. Ackley*, 64 Ark. App. 325, 984 S.W.2d 67 (1998). In determining whether a decision is supported by substantial evidence, we review the record to ascertain if the decision is supported by relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Arkansas State Bd. of Nursing v. Morrison*, 88 Ark. App. 202, 197 S.W.3d 16 (2004). In doing so, we give the evidence its strongest probative force in favor of the administrative agency; the question is not whether the testimony would have supported a contrary finding, but whether it supports the finding that was made. *Id.*

SOSRA argues that the evidence strongly supports the decision of the Committee, and that the trial court erred in ruling that the agency's decision was not supported by substantial evidence. Claybaugh responds that the examiner does not say how Claybaugh refused to comply or cooperate with this assessment or testing procedure, nor how he was deceptive and uncooperative.

Correctional counselor Diane Gray conducted the first portion of Claybaugh's assessment interview but was joined by Dr. George Simon after she requested his assistance. SOSRA, contending that substantial evidence supports its assessment that Claybaugh was uncooperative in his interview, alleges that Claybaugh "qualified" some of his answers to "simple yes or no" questions. When asked if he had shoplifted as a teenager, Claybaugh responded by asking if that included a pack of cigarettes; he also told Ms. Gray he had not been caught for the incident. He answered "no" when asked if he had set a building on fire but answered "not intentionally" when asked about ground fires. He was asked if he had ever had sex with a prostitute, and he answered "not that I paid for." He said that he had "seldom" experienced group sex. As shown in the dialogue later reproduced in this opinion, Claybaugh said that he "may have been high" when he committed the offense for which he was convicted and that he "did some methamphetamine" that night.

SOSRA argues that the answers in the previous paragraph show that Claybaugh was evasive and deceptive in his answers. SOSRA also lists Claybaugh's answers to questions about drug use as further evidence of evasive answers. Those include Ms. Gray's asking the last time he smoked "pot" and his answer, "I don't know . . . it's been years"; he did not answer when she asked how many years. Ms. Gray then asked, "Did you smoke? That would be just yes or no." Claybaugh replied, "Once." Ms. Gray asked how

much he was smoking before his incarceration, and he said "Almost none." She asked, "Occasionally?" He replied:

> I was not going out and getting any or buying any or working for any. I just can't honestly tell you I did not smoke any is what I am really telling you because I am sure I took a puff here or there somewhere, but basically it's been years since. . . .

Ms. Gray interrupted this answer to ask Claybaugh if he used "meth." He replied that he had not used it in years.

Because the transcript of the interview was central to the agency's determination, we reproduce much of it here and we italicize portions that SOSRA relies on in its brief. We begin when Ms. Gray asked Claybaugh to tell "his side," and in his own words, "what happened with the sex offense and what was going on." He responded that he had touched his fifteen-year-old daughter with a vibrator. The interview continued:[3]

> Q. What were you thinking about when you did that?
>
> A. That's really hard to say. I don't really know.
>
> Q. Ok. So you don't know what you were wanting to happen.
>
> A. I know what I was not wanting to happen but that's neither here nor there.
>
> Q. What did you not want to happen?
>
> A. I wasn't out to have sex with my daughter.
>
> Q. So what were you out to do?
>
> A. I really don't know.
>
> Q. What do you remember thinking about when that happened.

---

[3] So as not to interfere with the exchange between Claybaugh and his interviewers, we have left the punctuation, parentheses, and blanks largely intact and as it has been presented through the written transcript.

A. I really don't know what to say. I really don't.

Q. Ok. So, was this the first time that something like this ever happened?

A. Yes.

Q. Ok, so were you drunk or were you high, were you sober, what kind of state were you in?

Q. Do you remember if you were drinking?

A. I was not drinking.

Q. *Ok. Were you high?*

A. *I may have been.*

Q. *Ok. You would have been high on what?*

A. *That's a good question.*

Q. *What kind of drugs were you doing back in that time?*

A. *I wasn't really doing drugs at that time.*

Q. Ok. I am going to shoot straight with you Mr. Clay-baugh, you are starting to get on my nerves. When I ask you a question, you better give me an answer. Ok? I got other people I got to see. I just need for you to shoot straight.

A. Ok.

Q. Don't beat around the bush, don't go all the way over there to give me an answer, just spit it out, OK? Or I'm going to have to send you on your way.

A. Alright.

Q. Were you high on some kind of drugs when you touched your daughter with a vibrator?

A. Yes.

Q. What were you on?

A. It was supposed to have been methamphetamine, I don't believe it was.

Q. Ok. What kind of drug do you recall doing before you touched her[?]

A. It was supposed to have been methamphetamine.

. . . .

Q. So alright, she woke up and she asked you what you were doing and you told her that you were trying to wake her up. Do you recall all that happening?

A. Okay, yes I do.

Q. And she said that you left out of the room that she was in and she said that she saw you zipping up your shorts as you walked away.

A. That is not correct.

Q. You weren't masturbating her?

A. No, I was not.

Q. Ok. Why do you think she would make a statement like that?

A. That may have been what she thought she saw, I don't know.

Q. Ok. Any other things happen with your daughter. Did you ever touch her inappropriately before this time?

A. No.

Q. Did you ever have thoughts about her?

A. No.

Q. So, basically one day you just woke up and decided that you would take a vibrator and touch her between the legs.

A. I did not touch her between the legs.

Q. That's her statement.

A. I am aware of that.

Q. I am going with her statement today.

A. Ok.

Q. Because that's the official record and that's what you pled no contest to and that's what you go[t] convicted of. That's what I have to go with.

Q. So how did you touch her? What do you say happened?

A. I touched her in about the area of her belly button.

Q. Ok. So she was sleeping.

A. I don't think so.

Q. Then what were you doing?

A. I really don't know what I was thinking . . . you know, I'm hoping getting some counseling.

Q. The counselor can't tell you what you were doing. Only you know what you were doing at that time.

. . . .

A. I'm not trying to . . . .

Q. I know this is not pleasant and it's not something that you really want to dwell on . . . but I am trying to understand exactly what you were thinking or going through your head at the time.

A. Well, it wasn't anything _____, I really don't know, okay? I'm being honest with you. I'm not trying to put you off. I'm not trying to say anybody else is at fault for this but me. There have been two or three times that I

thought I had done things ＿＿＿ behind me. I believe I have to put it behind me. I have counseling. I'm not going to say that I don't need it. I'm not going to tell you I don't welcome it. If I need it, I welcome it. I'm not going to tell you I was a perfect father, but I was a damn good father.

Q. She made a statement that there has been several times that she felt like you were looking at her in a way that made her uncomfortable.

A. Are you aware that this is not the first time that she has made accusations of this type?

Q. Against you?

A. No.

Q. Against other people?

A. I am not pleading innocent here. I'm not.

Q. Ok. So, you don't remember having any kind of sexual thoughts or ＿＿＿ about her before this time when you touched her?

A. No, I did not.

Q. So, I want you to help me to understand this because I have to present your case before a team of people who will decide what your risk level is going to be.

A. I understand that.

Q. And you are really not giving me anything to work with here. Ok?

Q. That's where I'm coming from.

A. Here's where I'm coming from . . . . I took care of . . . I don't know how to explain this. I have done the best I could to put things behind us. I'm not a ＿＿＿ detective, I'm not a psychiatrist, I don't know whether she was abused very young or not I don't know for sure.

The transcript shows that taping ceased after four more short questions and answers. When taping resumed six minutes later, at 2:16 p.m., Dr. Simon was present with Ms. Gray. He was the only interviewer from then until the interview ended at 2:28 p.m. The italicized portions of the interview are those that SOSRA points to as further evidence of "evasive answers":

> DR. SIMON: Is this the only sex offense that you have?
>
> CLAYBAUGH: Yes.
>
> DR. SIMON: Do you have any other criminal history?
>
> CLAYBAUGH: I have been arrested on drugs once, you say twice, but I only remember once.
>
> DR. SIMON: Were you convicted on the drug charges?
>
> CLAYBAUGH: Yes.
>
> DR. SIMON: What was your conviction?
>
> CLAYBAUGH: If I remember correctly it was possession of marijuana with intent and possession of methamphetamine.
>
> DR. SIMON: This is your only sex offense?
>
> CLAYBAUGH: Yes.
>
> DR. SIMON: And what did you do exactly?
>
> CLAYBAUGH: I touched my daughter with a vibrator. It just happened. I am not trying to put you people off, I'm really not. I want to put this thing behind me and get some help. Ok? I don't see her.
>
> DR. SIMON: You could have gotten help any time. You can stop with the theatrics.
>
> CLAYBAUGH: I'm not . . .
>
> DR. SIMON: You need to lower your voice. You need to stop with the theatrics.

CLAYBAUGH: Okay.

DR. SIMON: And you can stop immediately.

CLAYBAUGH: Okay.

DR. SIMON: And you can stop lying when you're caught.

CLAYBAUGH: I'm not lying.

DR. SIMON: You can stop lying when you're caught. You know like I'm not gonna catch ya.

CLAYBAUGH: Okay.

DR. SIMON: I just want to know the situation of the circumstances how you came to do this. Was she visiting you?

CLAYBAUGH: No, I have had custody of her for years.

DR. SIMON: As a single role father?

CLAYBAUGH: On two different occasions, yes.

DR. SIMON: How did you happen to get custody?

CLAYBAUGH: It's a pretty long, drawn out battle.

DR. SIMON: Give me the simple . . .

CLAYBAUGH: Her mother physically abandoned her with her father.

DR. SIMON: Her natural mother and natural father abandoned her?

CLAYBAUGH: I am her natural father.

. . . .

DR. SIMON: And then what happens that one day you decided to do this . . . what was going on?

CLAYBAUGH: I am not trying to be ____ I really.

DR. SIMON: It is ____ stop.

CLAYBAUGH: I'm not trying

DR. SIMON: Stop with the theatrics and I won't warn you again.

CLAYBAUGH: She was scheduled to go to her maternal [sic] for visitation. I had not allowed her to go the year before. . . .

. . . .

CLAYBAUGH: It's been a rule of mine all along, okay? That the adults discuss the business end of things and she had been trying to . . . the time before had been the only time that I had not allowed her to go . . . there had been a reason

DR. SIMON: Right, but you're going someplace I hope because I just want to know the circumstances under which this happened.

CLAYBAUGH: I guess I got too screwed up and just screwed up.

DR. SIMON: I don't know what you mean.

CLAYBAUGH: *I did some methamphetamine,* I got too screwed up I guess, and I just screwed up I guess.

DR. SIMON: Do you typically get hypersexual on methamphetamine?

CLAYBAUGH: *hypersexual? I don't think so. (inaudible)*

DR. SIMON: *Is it one of the reasons you use it?*

CLAYBAUGH: *Actually, I quit using it years ago.*

DR. SIMON: *Is that one of the reasons you used it?*

CLAYBAUGH: *To be honest with you, I don't know why I did.*

DR. SIMON: *Who would know?* _____

CLAYBAUGH: _____

DR. SIMON: *The question being exactly the same, who would you know?*

CLAYBAUGH: *Methamphetamine does feel good. I*

DR. SIMON: Why did it take you so long to give such a straight forward, simple answer?

CLAYBAUGH: I didn't really think it did, I'm sorry.

DR. SIMON: We've already wasted 20 minutes more of my time than I had time to waste.

CLAYBAUGH: (inaudible) I'm sorry.

DR. SIMON: Do you think taking methamphetamine had something to do with what you did?

CLAYBAUGH: Ok, yes.

DR. SIMON: Were you doing anything else besides methamphetamine?

CLAYBAUGH: No.

DR. SIMON: And you said you did something with a vibrator?

CLAYBAUGH: I touched my daughter.

DR. SIMON: Touched her where?

(inaudible)

DR. SIMON: Was there anything else that _____?

CLAYBAUGH: I especially wanted _____ you a straight answer about what happened.

DR. SIMON: _____ that's just part of his character. He knows his character and he knows it's flawed. And he knows the reason it's flawed is that he's not straight with himself or other people. That's why his life is the way it is and why he has troubles in it; he knows that. He doesn't need us to tell him that. It's just not in him to be straightforward ___ when the truth is just ____. But I'm not seeing anything else myself. Are you seeing anything?

GRAY: Just this right here.

DR. SIMON: And I wouldn't expect that in this case. Based on what I'm sensing.

GRAY: Alright, I just wanted to check with you before I let him go.

DR. SIMON: Anything else you want to tell us ... anything you think is important?

CLAYBAUGH: I don't guess so.

DR. SIMON: You can wipe that serious look off your face. ____ can do that. You heard every word I said and you understand every word that I meant. You know exactly what it means so there's no reason for you to look surprised. You know exactly what's wrong with your character; you know how long it's been flawed; you know exactly what you need to do to fix it; and you really ought to stop acting ___; you really ought [to]; for your own sake.

Repeating its argument that Claybaugh's answers were deceptive, SOSRA submits that he "continued" refusing to give straightforward answers despite being warned by Dr. Simon. SOSRA points to Ms. Gray's written report of the interview: she stated that Claybaugh was evasive and acted as if he did not know why he committed the offense, and she noted Dr. Simon's conclusion that Claybaugh's character did not allow him to be truthful. SOSRA notes that the Committee, after listening to the tapes, found that Claybaugh was not credible. SOSRA complains that the trial court did not note what procedure was unlawful, and it concludes that the trial court substituted its judgment for that of the agency.

*Default Level 3*

SOSRA maintains on appeal that there was substantial evidence in the record to support the Committee's finding of default Level 3 against Claybaugh and, further, that the Committee properly followed all guidelines and laws with respect to his assessment. SOSRA notes that where an agency's decision is supported by substantial evidence, it automatically follows that the decision cannot be classified as arbitrary and capricious. *See Olsten Health Servs. v. Arkansas Health Servs. Comm'n*, 69 Ark. App. 313, 12 S.W.3d 656 (2000).

■  A sex offender who is shown by substantial evidence to have been deceptive, or who voluntarily terminates the assessment process after having been advised of the potential consequences, shall be classified by default as a Level 3 risk to the public safety. Ark. Code Ann. § 12-12-917(b)(4)(B)(ii)(*a*). The SOSRA guidelines at issue in this appeal allowed the Committee to override a low-risk actuarial assessment if an offender attempted to conceal or lie about behavioral histories, provided deliberately false or misleading information, or refused to submit to or seriously compromised the interview and assessment. Claybaugh had been informed that he would be assigned a high-risk classification should he withhold information, give false information, or seriously compromise the assessment team's ability to do a fair and accurate assessment.

In rendering its decision, the Committee noted that an offender was not required to admit guilt but was required to be open and honest as to his state of mind, intent, and actions. The Committee found Claybaugh not to be credible in the taped interview. Citing its policy that an offender who was "not open and honest during the assessment" could not be adequately assessed, the Committee allowed the Level 3 risk assessment to stand.

Contending that substantial evidence supports the Committee's decision, SOSRA argues that Claybaugh was uncooperative to the extent that the interviewer could not properly assess him. SOSRA characterizes particular answers by Claybaugh in the interview as qualified, evasive, and not being straightforward. These answers were in response to questions about a shoplifting incident while he was a teenager, sexual experiences, use of marijuana in past years, and use of methamphetamine at the time he committed the offense of second-degree violation of a minor.

SOSRA concludes that a fair-minded person would conclude from these answers that appellant was deceptive in his responses.

Claybaugh characterizes the issue on appeal as not one of credibility, but whether he was deceptive during his assessment. He argues that his answers "appear to be consistent with the documents assembled for the interview which are part of this record." Particularly, when Dr. Simon asked Claybaugh about the circumstances under which the offense occurred, Claybaugh admitted that he "did some methamphetamine" and "got too screwed up," and he responded affirmatively when asked if taking methamphetamine had something to do with his committing the offense. We agree that Claybaugh's answers appear to be consistent with documents assembled for the interview, and we hold that fair-minded persons considering his answers could not have concluded that he was deceptive.

Furthermore, Claybaugh argues that the Committee did not comply with the requirement of our Administrative Procedure Act that a final decision or order in an administrative adjudication shall include findings of fact and conclusions of law, separately stated. *See* Ark. Code Ann. § 25-15-210(b). (Repl. 2002). As Claybaugh notes in his brief, SOSRA has not cited any incident where his answers differed from documents assembled for the interview.

SOSRA responds in its reply brief that Claybaugh was deceptive in his answers. SOSRA argues that Claybaugh's 2002 interview could not be assessed by the 2004 guideline allowing an interviewer to conclude, if an individual's answers did not match up with the documents presented, that an individual was deceptive. However, SOSRA presented the 2004 guideline to the trial court to support its argument that 2002 regulations allowed an increased risk for an offender, and SOSRA has included the 2004 guidelines in the addendum to its appellate brief. Therefore, we will not consider its new argument that the guideline should not be considered.

We hold that the Committee disregarded the facts and circumstances of this case, as well as the applicable law and guidelines. We hold that fair-minded persons could not have reached the Committee's conclusion and that, under applicable statutes and the guidelines developed by SOSRA, there is no substantial evidence to support the Committee's decision to assign Claybaugh a default Level 3 on the basis of his answers during the assessment interview. Thus, we agree with the circuit court's

finding that Claybaugh's default classification was not supported by substantial evidence, was arbitrary and capricious, and was made upon unlawful procedure. Consequently, we reverse the decision of the Committee, and we affirm the decision of the circuit court reducing the default Level 3 to Level 1.

Affirmed.

BAKER and ROAF, JJ., agree.