2012 Ark. 74

**Cameka SULLIVAN, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 11–1026.**

Supreme Court of Arkansas.

Feb. 23, 2012.

J. Brent Standridge, Little Rock, for appellant.

Dustin McDaniel, Atty. Gen., by: Rachel Hurst Kemp, Little Rock, for appellee.

DONALD L. CORBIN, Justice.

Appellant, Cameka Sullivan, appeals the judgment of the Saline County Circuit Court sentencing her to a cumulative sentence of 216 months' imprisonment and convicting her of permitting the abuse of her minor child and hindering the apprehension or prosecution of her child's abuser. She asserts six points of error in her trial, including that her trial was not speedy, that the evidence was insufficient to support her convictions, that the circuit court committed trial errors in admitting hearsay, irrelevant, and speculative testimony and in allowing the State to improperly bolster the credibility of a witness, and that she was erroneously required to register as a sex offender. The Arkansas Court of Appeals affirmed her convictions. *Sullivan v. State*, 2011 Ark. App. 576, 378 S.W.3d 921. Appellant petitioned this court for review, asserting among other grounds, that the decision of the court of appeals is in conflict with this court's decision in *Duncan v. Wright*, 318 Ark. 153, 883 S.W.2d 834 (1994). Because we granted Appellant's petition for review, our jurisdiction of it is pursuant to Arkansas Supreme Court Rule 1–2(e) (2011). When we grant review following a decision by the court of appeals, we consider the appeal as though it had been originally filed in this court. *Glaze v. State*, 2011 Ark. 464, 385 S.W.3d 203. Upon such review, we find no error in the circuit court's judgment and affirm; the opinion of the court of appeals is vacated.

## I. *Speedy Trial*

Because a finding that a defendant's right to a speedy trial has been violated operates as a dismissal of charges with an absolute bar to prosecution, we first consider Appellant's argument that she was not timely brought to trial. Appellant filed two pro se motions to dismiss her case on speedy-trial grounds, and her counsel filed a motion that supplemented the pro se motions. The State filed a written response, and the circuit court held a hearing on December 7, 2009. The circuit court ruled from the bench at the conclusion of the hearing that the State had met its burden of proof and still had approximately sixty days in which to try Appellant. On June 15, 2010, the circuit court entered a written order denying Appellant's motion to dismiss "[f]or the reasons stated at the conclusion of the hearing." Appellant then filed a petition for writ of certiorari with this court, which we denied without prejudice by letter order dated June 21, 2010. *Sullivan v. Phillips*, CR 10–616. On appeal, Appellant argues that the circuit court erred in denying her motions to dismiss, and she specifically challenges two time periods the circuit court excluded from its speedy-trial calculation.

Pursuant to Rule 28.1 of the Arkansas Rules of Criminal Procedure (2011), the State is required to try a criminal defendant within twelve months, unless there are periods of delay that are excluded pursuant to Rule 28.3 of the Arkansas Rules of Criminal Procedure (2011). *Yarbrough v. State*, 370 Ark. 31, 257 S.W.3d 50 (2007). If a defendant is not brought to trial within the requisite time, Rule 30.1 of the Arkansas Rules of Criminal Procedure (2011) provides that the defendant is entitled to have the charges dismissed with an absolute bar to prosecution. *Id.* Once the defendant establishes that the trial is or will be held outside the applicable speedy-trial period, she has presented a prima facie case of a speedy-trial violation, and the State then has the burden of showing that the delay was the result of the defendant's conduct or was otherwise justified. *Id.* On appeal, we conduct a de novo review to determine whether specific periods of time are excludable under our speedy-trial rules. *Id.*

■ Appellant was arrested on July 10, 2005, and charged the next day with first-degree battery and hindering apprehension. The State later amended the battery charge to permitting abuse of a minor. Appellant was tried and convicted of those two charges on June 22, 2010. Therefore, she has demonstrated that her trial occurred more than twelve months from her arrest, and the burden is on the State to show that the delay was the result of Appellant's conduct or otherwise justified. For the reasons expressed in our following analysis, we conclude that the State has satisfied its burden of demonstrating that the delay was due to Appellant's conduct.

Appellant's case was first set for trial on April 6, 2006. The circuit court correctly ruled that this period of just less than nine months was charged against the State in calculating the speedy-trial period. The State therefore had approximately three months, or ninety days, in which to try Appellant.

Appellant concedes that the record reflects that her case was continued from the first trial date of April 6, 2006, until the subsequent trial date of November 22, 2006, and that this time period is properly excluded from the speedy-trial calculation. Appellant also concedes that her case was continued by agreement from the November 22, 2006 trial date until a new trial date of May 15, 2007. Appellant thus agrees that this time was properly excluded from her speedy-trial calculation.

Appellant also concedes that the circuit court's docket reflects that her case was called for trial on December 11, 2007, but argues that there is nothing in the record to reflect that the period from May 15, 2007, to December 11, 2007, should be excluded from her speedy-trial calculation. Appellant's argument with respect to this time period is without merit. At the hearing on her motion to dismiss, Paul K. "Pete" Lancaster, the attorney who represented Appellant during the contested time period, testified that both she and her child's abuser, Victor Lyons, were to be tried as codefendants on May 15, 2007, but that he requested a continuance of Appellant's trial because she was involved in an automobile accident on the way to the courthouse.[1] This time period was thus properly excluded pursuant to Rule 28.3(c) as a continuance granted at the request of Appellant's counsel. Lancaster's request for a continuance was made in chambers during Lyons's trial and was recorded by the court reporter. The transcript of that in camera request was admitted into evidence during the hearing on Appellant's motion to dismiss, and it clearly reflects that Lancaster requested the continuance and the tolling of the speedy-trial time due to Appellant's accident and injury on the way to court.

On appeal, Appellant takes issue with the fact that the new trial date was not set contemporaneously with the request for the continuance. After initially expressing concern about this time period, the circuit court observed that the trial date was reset for December 11, 2007, by letter from the court's case coordinator dated June 27, 2007. Thus, the circuit court ruled that the record of the discussion in chambers combined with the court's June 27, 2007 letter comprised a sufficient record to support the tolling of the speedy-trial time for the period from May 15, 2007, to December 11, 2007.

■ We affirm this ruling as correct, as there is no requirement in Rule 28.3(c) that the new trial date be set contemporaneously with the granting of the continu-

---

1. Lyons's trial proceeded. His conviction for first-degree battery was affirmed in an unpublished opinion by the court of appeals. *Lyons v. State*, CACR 07–946, 2008 WL 2192140 (Ark.App. May 28, 2008) (unpublished).

ance, and as the failure to do so here was likely because Appellant's trial counsel requested and was granted the continuance in the midst of the ongoing trial of Appellant's codefendant. Appellant's current counsel conceded at the speedy-trial hearing that December 11, 2007, was the next available trial date. Rule 28.3(c) requires only that the continuance be granted to a date certain, and that was accomplished with the June 27, 2007 letter. Excluded periods without a written order or docket entry will be upheld when the record clearly demonstrates that the delays were attributable to the accused or legally justified and where the reasons were memorialized in the proceedings at the time of the occurrence. *See Miles v. State,* 348 Ark. 544, 75 S.W.3d 677 (2002).

Appellant next challenges the period of time from December 11, 2007, to April 8, 2008, and then to May 20, 2008, and argues that this is the most compelling reason her trial was not timely. Her challenge to this time period is wholly without merit, however, as the following facts demonstrate that this period of delay resulted either from Appellant's conduct in resisting appearance at her trial or from other criminal proceedings concerning Appellant, both of which are excludable periods under Rule 28.3.

Appellant concedes that the docket reflects that she failed to appear for her trial on December 11, 2007, and that a bench warrant for her failure to appear was authorized and issued on December 13, 2007. She also concedes that in April 2008 she was stopped in North Little Rock, Arkansas, on a traffic violation, and then arrested on an outstanding warrant in Texas and extradited there. She further concedes that she was in the custody of the State of Texas from April 2008 to January 2009. Records introduced during the testimony of Larry McCallister, a deputy with the warrants division of the Saline County

Sheriff's Department, indicate that Appellant had been arrested on April 8, 2008, and extradited to Texas on April 10, 2008. Those records also showed that Saline County was notified on April 21, 2008, that Appellant was in fact incarcerated in Texas. On May 21, 2008, Deputy McCallister then notified the Texas authorities of Appellant's failure-to-appear warrant and placed a "hold" on Appellant. On May 29, 2008, the Texas authorities acknowledged receipt of the request to hold Appellant and gave an estimated release date for Appellant as January 2009. Appellant signed a waiver of extradition to Arkansas on December 3, 2008. According to the deputy, as soon as he was notified that Appellant had completed her Texas sentence, she was extradited back to Arkansas and appeared in Saline County Circuit Court on January 20, 2009.

Appellant concedes that the time from May 21, 2008, when the Arkansas authorities placed the hold on her in Texas, until she appeared back in court on January 20, 2009, is a properly excludable period. However, Appellant argues that once the failure-to-appear warrant was issued on December 13, 2007, in order for the State to get the benefit of an excludable period to May 20, 2008, the State must demonstrate that it made an attempt to serve the failure-to-appear warrant on her without unnecessary delay as required by *Duncan,* 318 Ark. 153, 883 S.W.2d 834. Appellant argued in her petition for review that the court of appeals's opinion conflicted with *Duncan,* and it is upon that basis that we granted review.

We reject Appellant's argument with respect to *Duncan,* as it completely overlooks the pivotal factual distinction between the two warrants at issue. *Duncan* involved an arrest warrant for the initial criminal charge, while the present case involves a warrant for failure to appear at

a trial that was set to occur within the speedy-trial time. The sole issue before this court in *Duncan* was whether the two-year period of delay between the date of information and date of arrest was excludable for good cause under Arkansas Rule of Criminal Procedure 28.3(h). Duncan had been charged in January 1992 with writing three hot checks in Garland County. A warrant for Duncan's arrest on the hot-check charges was issued the same day the information was filed, but he was not arrested on the warrant for those charges until January 1994. The State's response before the trial court was that Duncan's change of address and use of an alias prevented a more expeditious arrest. Duncan countered that the State was required to use due diligence to find and arrest him, but failed to do so. There was no evidence the State made any attempt to serve the arrest warrant on Duncan, and this court granted Duncan a speedy-trial dismissal on that basis. It is of pivotal importance to realize, however, that the warrant at issue in *Duncan* that the State failed to timely serve was the initial arrest warrant on the main criminal charge of writing hot checks. *Duncan* did not involve an arrest warrant for failure to appear at a criminal trial, as does the present case. For that reason, *Duncan* is not even applicable to, much less controlling of, the present case. The circuit court in the present case therefore correctly ruled that the State's actions in serving the warrant for Appellant's failure to appear at her trial on December 11, 2007, had no effect on the calculation of her speedy-trial time for the charges of permitting abuse and hindering apprehension.

The fact remains that the State met its burden here by offering Appellant a trial date of December 11, 2007, which was well within the twelve-month speedy-trial period. Appellant failed to appear at that trial. It is true that a defendant is not required to bring herself to trial or to "bang on the courthouse door" to preserve her right to a speedy trial and that the burden is on the prosecutors and the courts to see that the trial is held in a timely fashion. *Davis v. State*, 375 Ark. 368, 372, 291 S.W.3d 164, 167 (2009) (quoting *Jolly v. State*, 358 Ark. 180, 193, 189 S.W.3d 40, 46 (2004)). However, it is also true that we have placed responsibility on a defendant to be available for trial; thus, time delays resulting from a defendant's resisting appearance for trial are properly excluded under Rule 28.3. *Doby v. Jefferson County Circuit Court*, 350 Ark. 505, 88 S.W.3d 824 (2002); *Osborn v. State*, 340 Ark. 444, 447, 11 S.W.3d 528, 530 (2000) (stating that when a defendant fails to appear for trial, the duration of the defendant's unavailability is clearly an excludable period for speedy-trial purposes under Rule 28.3(e)); *Smith v. State*, 313 Ark. 93, 852 S.W.2d 109 (1993); *Horn v. State*, 294 Ark. 464, 743 S.W.2d 814 (1988).

We note that there was some argument at the hearing by Appellant's counsel that the record did not demonstrate that Appellant had ever received notice of the December 11, 2007 trial date, since it was not set contemporaneously with the continuance granted at her previous trial with her codefendant on May 15, 2007. However, Lancaster testified that he mailed Appellant a letter notifying her of the December 11, 2007 trial date, and the letter was returned to him. Lancaster stated further that he seemed to recall Appellant giving him a change of address, and that although he talked to Appellant once or twice shortly following the May 15, 2007 continuance, he was not in contact with Appellant at all after that and did not know her whereabouts at the time of trial when she failed to appear. It is not disputed that Appellant knew of her May 15, 2007 trial date and that it was continued due to her automobile accident on the way to the courthouse. Thus, although there is some ques-

tion on the record before us whether she ever received notice of the date to which her trial was continued, December 11, 2007, the record is clear that she was aware that her trial would be rescheduled after her car wreck, that her attorney could not find her, and that she has offered no explanation as to why. We conclude the foregoing is sufficient to show that Appellant made no effort to satisfy her responsibility of making herself available for trial. In this way, Appellant's case is similar to *Thompson v. State*, 264 Ark. 213, 570 S.W.2d 262 (1978), and is distinguished from *Chandler v. State*, 284 Ark. 560, 683 S.W.2d 928 (1985), where this court held that the State had a duty to make a diligent, good-faith effort to bring an accused to trial, and the State failed to do so when it did not check the available court records or otherwise demonstrate any diligent attempt to locate the accused when she failed to appear for plea and arraignment. We therefore affirm the circuit court's finding that Lancaster's testimony bolstered the State's contention that this time should be excluded due to Appellant's absence after December 11, 2007, until her arrest on April 8, 2008.

Appellant also takes issue with the time period from April 8, 2008, when she was arrested in North Little Rock and extradited to Texas, to January 20, 2009, when she returned to Arkansas and appeared in court. First, Appellant argues that no detainer was lodged against Appellant until May 21, 2008, even though she was taken into custody by the Texas authorities on April 10, 2008. Thus, Appellant asserts that the period from April 8, 2008, to January 20, 2009, should not be excluded from her speedy-trial time. This argument is without merit as she was arrested on April 8, 2008, extradited to Texas on April 10, 2008, held in custody on other charges in Texas, and then returned to Arkansas and appeared in court on January 20, 2009. This period of time during which Appellant was held in custody on other charges is excludable pursuant to Rule 28.3(a) as a "period of delay resulting from other proceedings concerning the defendant." *Allen v. State*, 294 Ark. 209, 212, 742 S.W.2d 886, 889 (1988).

At the January 20, 2009 appearance, Appellant's trial was set for February 24, 2009. On February 19, 2009, however, Appellant sought and was granted yet another continuance. Thus, the circuit court correctly ruled that this one-month period from January 20, 2009, to February 19, 2009, was not to be excluded. That left approximately sixty days in which the State could timely try Appellant. From February 19, 2009, until the date of trial on June 22, 2010, Appellant was granted further continuances, and she does not challenge this time period.

In summary, of the time periods challenged by Appellant, the period from May 15, 2007, until December 11, 2007, was excluded at the request of Appellant due to her injuries from a car accident. The period from December 11, 2007, when she failed to appear for trial, to April 8, 2008, when she was arrested, was excluded as a result of Appellant's conduct in failing to appear for her trial. The period from April 8, 2008, when she was arrested and extradited to Texas to serve a sentence there on other charges, to January 20, 2009, when she was returned to Arkansas and appeared in court, was properly excluded as a period of delay resulting from other proceedings concerning Appellant. For the aforementioned reasons, none of Appellant's arguments that any of this time should be excluded has merit. Thus, the circuit court correctly concluded that Appellant's right to a speedy trial was not violated, and we affirm that ruling.

## II. *Sufficiency of the Evidence*

Appellant challenges the sufficiency of the evidence to support the jury verdicts

convicting her of permitting the abuse of L.B., her then twenty-three-month-old daughter, and hindering apprehension or prosecution of L.B.'s abuser, Appellant's boyfriend, Victor Lyons. The circuit court denied Appellant's timely and specific motions for directed verdicts on both charges.

■ An argument contesting the denial of a directed verdict is a challenge to the sufficiency of the evidence, and protection of Appellant's double-jeopardy rights requires that we address such an argument prior to addressing other asserted trial errors. *Harris v. State*, 284 Ark. 247, 681 S.W.2d 334 (1984). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Graham v. State*, 365 Ark. 274, 229 S.W.3d 30 (2006). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* When a defendant challenges the sufficiency of the evidence that led to a conviction, the evidence is viewed in the light most favorable to the State. *Id.* This court does not weigh the evidence presented at trial, as that is a matter for the factfinder; nor do we assess the credibility of the witnesses. *Ewell v. State*, 375 Ark. 137, 289 S.W.3d 101 (2008). In assessing the weight of the evidence, a jury may consider and give weight to any false and improbable statements made by an accused in explaining suspicious circumstances. *Watson v. State*, 290 Ark. 484, 720 S.W.2d 310 (1986); *Reams v. State*, 45 Ark.App. 7, 870 S.W.2d 404 (1994).

We first address the conviction for permitting child abuse. Appellant was charged with violating Arkansas Code Annotated § 5–27–221 (Supp.2005), which in July 2005, when the crime was alleged to have occurred, provided in pertinent part:

(a)(1) A person commits the offense of permitting abuse of a minor if, being a parent ... he or she recklessly fails to take action to prevent the abuse of a minor.

(2) It is a defense to a prosecution for the offense of permitting abuse of a minor if the parent ... takes immediate steps to end the abuse of the minor, including prompt notification of medical or law enforcement authorities, upon first knowing or having good reason to know that abuse has occurred.

(3) Permitting abuse of a minor is a Class B felony if the abuse of the minor consisted of sexual intercourse or deviate sexual activity or caused serious physical injury or death to the minor.

Arkansas Code Annotated § 5–2–202(3) (Repl.2006) defines "recklessly" as follows:

(A) A person acts recklessly with respect to attendant circumstances or a result of his or her conduct when the person consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur.

(B) The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

When previously considering these two statutes, this court has explained that "if abuse is occurring, and the defendant is aware of that abuse, she is criminally liable if she does nothing to prevent further abuse." *Graham*, 365 Ark. at 278–79, 229 S.W.3d at 34 (footnote omitted).

Appellant argues, as she did below, that the State's proof failed to create a factual question as to whether Appellant knew that L.B. was being abused and as to whether she failed to do anything about it. Appellant relies on the testimony of the State's medical expert that the life-threatening physical injury to L.B.'s brain oc-

curred within twenty-four hours of her appearance at the emergency room, and possibly within three to four hours. Appellant argues further, as she did below, that she offered proof sufficient to meet the statutory defense of taking immediate action and notifying medical authorities when she took L.B. to Arkansas Children's Hospital (ACH). The circuit court denied Appellant's motion for directed verdict on the basis that the State had offered sufficient proof of injuries to L.B.'s hands and buttocks that occurred prior to the much more serious brain injury, and therefore the State had created a factual question for the jury. The jury's verdict was that Appellant was guilty of permitting abuse of L.B. that caused serious physical injury.

Our review of the record reveals the following substantial evidence to support this verdict. Appellant brought L.B. to the emergency room at ACH at approximately 11:00 a.m. on July 8, 2005. She told the hospital personnel that L.B. had fallen from a bunk bed from a height of five feet, cried for a while, then seemed alert and fine, and subsequently became unresponsive.

Dr. Maria Esquivel, a pediatrician at ACH, was established as an expert in the field of child abuse. She stated that, as a member of the hospital's team of doctors, nurses, and social workers for children at risk, she is called in as a specialist by other doctors at the hospital when they have a question concerning whether a child's injury does not correspond to whatever history was provided.

Dr. Esquivel examined L.B. in the pediatric intensive-care unit after she had been there for two days. The history of the emergency-room records that Dr. Esquivel reviewed indicated that L.B. came in unresponsive. The radiology records she reviewed indicated that L.B.'s brain was bleeding inside and was showing an increased intracranial pressure that was causing L.B.'s skull bones to spread. Dr. Esquivel testified that L.B.'s brain injury was life-threatening.

Dr. Esquivel stated that the history Appellant gave of L.B. being alert immediately after the injury was unusual with such a traumatic injury. Dr. Esquivel explained that a brain injury such as L.B.'s is usually seen in children who had stopped breathing after some traumatic injury and experienced a loss of oxygen to the brain, or in children who had been shaken severely thereby causing the child to stop breathing and pass out. Dr. Esquivel opined that if L.B. had incurred this injury from a fall, it would have had to have been a fall involving increased velocity such as from a second-story building, and not from a bunk bed some five or even six feet high.

Dr. Esquivel explained that L.B. had other indications that her brain injury was not accidental, including numerous hemorrhages in the eyes and different layers of the retina. The expert stated that when both the eyes and the brain show signs of hemorrhage, it is more likely that the child was shaken. Dr. Esquivel also opined that L.B.'s brain injury could have been caused by an adult who violently slung her head against a wall, but that a child could not have exerted enough force to cause this severe of an injury.

According to Dr. Esquivel's testimony, when Appellant presented L.B. to ACH with this brain injury, L.B. also had signs of other injuries all over her body that were significant to her diagnosis that L.B. had suffered child abuse. Radiology records showed some congestion in the tissues of the mesentery, indicating that L.B. suffered some blunt trauma to her abdomen. L.B. also had an injury to her liver. Dr. Esquivel opined that these internal abdominal injuries would be consistent with a shaken baby or with a child whose head was struck against a wall. L.B. also

had swelling and bruising around her ear, consistent with an adult swinging her head against a wall. Dr. Esquivel opined that the bruise to L.B.'s ear occurred near the same time as the brain injury. L.B. had numerous, unusual pinprick lesions surrounded by bruising on the sole of her left foot and on her back. The only explanation for these lesions that Dr. Esquivel could think of was that someone had poked L.B. with a safety pin or straight pin trying to arouse her and have her respond, if she had been unresponsive.

Dr. Esquivel testified to numerous other older injuries visible on L.B.'s body. L.B. had numerous scabbed lesions all over her body, including her forehead, in the middle of her chest and around her breasts, near her belly button, near her genital area, below her right knee, and on her back. L.B. also had a fresher lesion inside her left thigh that looked like a blister or just broken skin. L.B. had three dark scars on the outside of her right thigh. She also had light-colored scars on her buttocks indicating "that she had had some kind of injury there in the past, but when it healed, it left the light skin." Dr. Esquivel opined that the scratches and lesions seen all over L.B.'s body were not typical toddler injuries.

An injury on the top of L.B.'s left hand was particularly impressive to Dr. Esquivel. She testified that L.B.'s left hand was very swollen and had two very deep craters with scab tissue surrounded by some lighter areas where the lesion had been larger and contracted as it healed. L.B.'s right hand had similar lesions but was not swollen. According to Dr. Esquivel, the injury to L.B.'s left hand was older than her brain injury and would have been painful for the child. Dr. Esquivel testified, over Appellant's objection, that L.B.'s hand injury would have been immediately apparent to a care giver.

Marci Rhodes, a social worker at ACH who assists when there are concerns about a child's maltreatment or abuse, testified that she spoke with Appellant and Lyons about L.B.'s injuries. Rhodes testified that Lyons's demeanor was aggressive and argumentative, while Appellant's demeanor was very quiet, with a lack of tears, emotion, expression, or involvement. Appellant told Rhodes that L.B. had fallen off a bunk bed, but had no explanation for Rhodes about the older injuries. Appellant told Rhodes that she and Lyons had been L.B.'s only care givers for the past month.

Detective Corporal Gary Robertson of the Saline County Sheriff's Department testified that on July 10, 2005, he responded to a call of severe child abuse at ACH. Corporal Robertson stated that after obtaining information there, he found Lyons and Appellant at her home, along with her other two daughters. Corporal Robertson testified that he immediately took Lyons into custody and informed Appellant that the Arkansas Department of Human Services (DHS) would soon be coming to take the other children. According to Corporal Robertson, Appellant assisted with gathering some clothes and releasing the girls to DHS, and was not crying or upset. While in the home, Corporal Robertson observed a hallway with a couple of holes in it. He also observed a bedroom that was within eyesight of the hallway and furnished with bunk beds and a carpeted floor. He stated that the bedroom door had a two-inch gap between it and the floor. He opined that a set of hands could fit very easily under the door. Corporal Robertson testified that after DHS picked up the children, he returned to the sheriff's office with Lyons and Appellant, where he took a statement from Appellant after reading her her *Miranda* rights.

In her statement, which was recorded and played to the jury, Appellant told police that she heard L.B. crying, so she went to her and checked to see if anything was wrong but did not find anything. She then asked her other two daughters what happened, and they responded that she fell off the bunk bed. Appellant also told police that soon thereafter L.B. became unresponsive, so she and Lyons took her to the hospital. Also in her statement, Appellant told police that she and Lyons were the only ones who took care of her children, and she specifically denied ever leaving her children alone.

Appellant's oldest daughter, Z.B., was six years old when L.B. sustained the serious head injury. She testified at trial that her mother left her alone to take care of her two younger sisters for a couple of days while Appellant and Lyons went to Texas. Z.B. also testified that Lyons kept her and her sisters while her mother was at work, and that he treated L.B. badly. Z.B. explained that Lyons pulled L.B.'s hands under the door causing them to bleed and L.B. to cry. She explained further that she saw Lyons put a fork down L.B.'s throat and push her off the balcony. With respect to L.B. getting her head hurt, Z.B. testified that she and her middle sister C.B. were in the bedroom when they saw Lyons in the hallway "[h]itting [L.B.] up against the door." Z.B. testified that Appellant was not at home when that happened, but that she and her mother did go with L.B. to the hospital after L.B. hurt her head. Z.B. testified that Appellant asked her to say that the cause of L.B.'s head injury was a fall from the bunk bed, but that the truth was that Lyons had caused the injury. Z.B. testified that Lyons treated L.B. differently than he did her and her middle sister. When asked to explain how Lyons treated them differently, Z.B. responded, "We didn't get our heads beat against the wall."

As to Appellant's knowledge of Lyons's maltreatment of L.B., Z.B. testified that Appellant was present when Lyons put the fork down L.B.'s throat. Z.B. also testified that she had told her mother that Lyons had hurt L.B.'s hands and that Lyons had hurt L.B.'s head, and that both times Appellant's response was, "No he didn't."

There is additional evidence we could recite, some of which we discuss while considering Appellant's assertions of evidentiary errors, but we do not discuss that evidence here because the foregoing is more than sufficient to support Appellant's conviction for permitting the abuse of her twenty-three-month-old daughter. The evidence shows that this was not an isolated incident, as Z.B. testified that she told her mother of earlier instances of abuse, and her mother's only response was to deny the abuse. In addition, the medical evidence established that L.B. was covered with visible scars and older injuries that would have been apparent to a care giver. The jury could thus reasonably infer that Appellant consciously disregarded a substantial risk that the abuse existed, would continue to exist, and failed to take action to prevent the abuse. L.B. then sustained a life-threatening brain injury that resulted in permanent brain damage limiting her ability to walk, talk, eat, and sit upright. The jury could thus infer that Appellant's actions in taking the previously abused and unresponsive child to the hospital did not satisfy the requirements of the statutory defense. When we consider Appellant's improbable statement and explanation in this case, along with the medical evidence as to the nature and number of injuries to the child, we are persuaded that, taken together, they are sufficient to constitute not only substantial but also overwhelming evidence of Appellant's guilt. Accordingly, we cannot say the circuit court erred in denying Appellant's motion for directed

verdict of acquittal on the charge of permitting the abuse of her minor child.

With respect to the charge of hindering apprehension or prosecution, Appellant was charged with violating Arkansas Code Annotated § 5–54–105 (Repl. 1997), which in July 2005, stated in pertinent part:

> (a) A person commits an offense under this section if, with purpose to hinder the apprehension, prosecution, conviction, or punishment of another for an offense, he:
>
> . . . .
>
> (6) Volunteers false information to a law enforcement officer; or
>
> (7) Purposefully lies or attempts to purposefully provide erroneous information, . . . which he knows to be false to a certified law enforcement officer that would distract from the true course of the investigation or inhibit the logical or orderly progress of the investigation.

Appellant argues that there was no evidence that she harbored or concealed Lyons, or that she provided authorities with false information with the purpose of hindering investigation of Lyons. She relies on the fact that Lyons was arrested at her home without incident and without any interference from her. The circuit court rejected this argument on the basis that the jury could derive a person's intent from that person's conduct, and there was sufficient evidence of Appellant's conduct here to submit the question to the jury.

Our review of the record reveals that there is substantial evidence to support Appellant's conviction on this charge. Appellant consistently told medical personnel, as well as police officers, that L.B.'s injury was caused by falling from the top of the bunk beds. Appellant offered this account to police in her statement even after admitting to police that doctors had informed her that L.B. had been shaken and there was no other way L.B. could have sustained such a severe injury. Z.B. testified at trial that she told Appellant that Lyons had hurt L.B.'s head; thus, the jury could have very reasonably inferred that Appellant gave this false explanation to police at a time when Appellant knew what had actually happened. There was thus substantial evidence from which a jury could have concluded that Appellant provided false information to police. And, that is all that is required under section 5–54–105(a)(6). In addition, however, there is Z.B.'s testimony that Appellant asked her to perpetuate that false information by asking her to tell everyone that L.B. had fallen from the bunk bed. As the circuit court ruled, the jury could have inferred from this testimony of Appellant's conduct that she gave false information to police with the purpose of hindering the prosecution of L.B.'s abuser. Accordingly, we conclude that the circuit court did not err in denying Appellant's motion for directed verdict of acquittal on the charge of hindering the apprehension of her child's abuser.

## III. *Bolstered Testimony of Z.B.*

As her third point for reversal, Appellant contends that the circuit court erred in permitting the State on redirect examination to improperly bolster the credibility of Z.B. by effectively allowing her to read the testimony she had given at the trial of Appellant's codefendant, Victor Lyons. Appellant complains that by employing this procedure, whereby the prosecuting attorney read questions and answers from the transcript aloud and then asked Z.B. to confirm that it was accurate, the State was permitted to highlight prejudicial aspects of Z.B.'s former testimony, including that Appellant told Z.B. to lie and that Z.B. told Appellant about the previous injuries to L.B.'s hands.

Appellant objected below on the grounds that the State was improperly bolstering Z.B.'s credibility. On appeal, Appellant expands on her argument below with a citation to *Kitchen v. State*, 271 Ark. 1, 607 S.W.2d 345 (1980), and the contention made for the first time on appeal that the State was improperly using Z.B.'s testimony as a prior consistent statement to rehabilitate Z.B., even though there had not been a charge of recent fabrication or improper influence as provided in Rule 801(d)(1)(ii) of the Arkansas Rules of Evidence (2011). It is well settled that a party is bound by the nature and scope of the objections and arguments made at trial and may not enlarge or change those grounds on appeal. *See, e.g., Frye v. State*, 2009 Ark. 110, 313 S.W.3d 10. We therefore do not address the component of Appellant's argument concerning the hearsay concepts expressed in Rule 801(d)(1)(ii) and the *Kitchen* case.

In support of her argument that the State used the transcript to improperly bolster the witness, Appellant relies on the general rule that the credibility of a witness cannot be bolstered unless that witness has been impeached. *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997). And even then, argues Appellant, the State may not bolster in the manner in which it did here.

The State responds that Appellant mischaracterizes the State's use of Z.B.'s former testimony as a prior consistent statement. The State points out that it did not offer the former testimony into evidence at all but used it only demonstratively, after Z.B. had been impeached, to refresh her recollection of the circumstances of Lyons's abuse of L.B. some five years earlier. Thus, the State contends that it properly used the transcript of Z.B.'s former testimony to refresh her recollection pursuant to Rule 612 of the Arkansas Rules of Evidence (2011).

Our review of the record in this case reveals that Z.B. was indeed impeached on cross-examination by Appellant's counsel after she testified on direct that she could not remember whether she had told Appellant that Lyons hurt L.B.'s hands or that he was mean to L.B. During redirect, the State then used Z.B.'s former testimony to refresh her recollection of the events she testified to some five years earlier when she was approximately six years old. Appellant's counsel used the transcript of Z.B.'s former testimony to impeach her, and the State used the same transcript to refresh her recollection.

A witness may occasionally consult a writing to refresh her memory, but it is her testimony and not the writing that is to be the evidence. *Dillon v. State*, 317 Ark. 384, 877 S.W.2d 915 (1994). However, a witness may not read a transcript into evidence, as that is beyond the bounds of refreshing recollection. *Id.* To allow a witness's memory to be refreshed and the extent to which the witness may refer to writings to refresh his memory are all decisions within the sound discretion of the circuit court that are not reversed on appeal unless the circuit court has abused that discretion. *See id.; see also Sweat v. State*, 307 Ark. 406, 820 S.W.2d 459 (1991); and *Goodwin v. State*, 263 Ark. 856, 568 S.W.2d 3 (1978). Here, we defer to the circuit court's superior position to judge the extent to which the prosecuting attorney and witness were referring to the transcript rather than reading it into evidence. We cannot say the circuit court abused its discretion here as the eleven-year-old child witness had indeed been impeached and was testifying to matters she had testified to some five years previously at the age of six years.

### IV. *Testimony of Sonya Yenner*

As her fourth point for reversal, Appellant contends that the circuit court

erred in allowing Appellant's neighbor Sonya Yenner to give testimony that was hearsay, irrelevant, and prejudicial. Appellant asserts that the State called Yenner to testify that Appellant was improperly supervising her children and that the testimony was offered to sully Appellant in the minds of the jurors.

Yenner testified over Appellant's relevancy objection that she had been Appellant's neighbor during the time of L.B.'s abuse and that on one occasion when Z.B. was in kindergarten, she saw Z.B. alone at the bus stop on a day that school was not in session. Yenner testified, over Appellant's hearsay objection, that Z.B. told her that Appellant was inside their home sleeping. Yenner stated that she walked Z.B. home and knocked on the door for approximately fifteen minutes before Appellant answered the door. She further testified about an incident in which she had to get the neighborhood security to go to Appellant's home because the children were there alone and playing outside in the cold rain in their underwear. Yenner stated that Appellant arrived home shortly after security went to her house and explained that she had been down the street trying to fix her boyfriend's car.

With respect to Appellant's hearsay argument, the State responds that, even assuming arguendo that the statement about Appellant being inside sleeping was inadmissible hearsay, the statement was not prejudicial. The State explains that the material testimony was that Appellant was not concerned about the welfare of her daughter, whom she sent to the bus stop alone on a day that school was not in session, and then did not answer the door for fifteen minutes despite Yenner's repeated knocking. According to the State, the fact that Appellant was sleeping was not material or significant. We agree, and thus conclude that the admission of this statement challenged as hearsay was not prejudicial.

With respect to Appellant's relevancy objection, the State responds that the evidence at issue here—a neighbor's accounts of Appellant leaving her young children unsupervised—was relevant because it tended to prove a material issue in the case. As previously discussed, the State had the burden of proving that Appellant "recklessly fail[ed] to take action to prevent the abuse of [her child]." Ark. Code Ann. § 5–27–221(a)(1). Thus, according to the State, the challenged evidence showing Appellant's inattention to her children and her general disregard for their safety and well being makes her failure to take any action to prevent harm to her children more probable.

Rule 401 of the Arkansas Rules of Evidence (2011) defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Under Rule 403 of the Arkansas Rules of Evidence (2011), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. The determination that evidence is relevant, and the weighing of whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice to the accused, are matters within the trial court's sound discretion. See Wyles v. State, 357 Ark. 530, 182 S.W.3d 142 (2004); Gunter v. State, 313 Ark. 504, 857 S.W.2d 156 (1993).

We agree with the State that the challenged evidence was probative of the material issue of Appellant's failure to take action to prevent abuse to her children. Its probative value was enhanced significantly given Appellant's own statement to police that she had never left her children

unattended. It also corroborated Z.B.'s testimony that Appellant left her three children unattended for a couple of days while she and Lyons went to Texas. We therefore agree that the probative value of Yenner's testimony was not substantially outweighed by the danger of unfair prejudice, and we cannot say the circuit court abused its discretion in allowing the challenged testimony.

## V. Speculative and Irrelevant Testimony

For her fifth point for reversal, Appellant contends that the circuit court erred in allowing two witnesses, Dr. Esquivel and Appellant's mother, to give speculative and irrelevant testimony to the effect that it would have been immediately apparent to Appellant that L.B. had incurred injuries. Appellant argues that the State was attempting to convey that Appellant actually knew about the injuries but chose to do nothing about them and thus permitted the child to be abused. Appellant contends this was prejudicial error warranting a new trial. This argument is without merit.

Dr. Esquivel, the pediatrician at ACH, was established as an expert in the field of child abuse based on her extensive training as a physician, her past employment as medical director of a child-abuse program, and her current affiliation with ACH's team for at-risk children. She stated that she had examined approximately 1,500 children who had been physically abused. Dr. Esquivel testified that an injury like the one on L.B.'s hand would have been immediately apparent to the child's care giver. Appellant objected to this testimony, arguing that lay people could draw their own conclusions about it. On appeal, Appellant cites *Buford v. State*, 368 Ark. 87, 243 S.W.3d 300 (2006), and contends that this testimony was not beyond the ability of the jurors to understand and draw its own conclusions, and therefore, it was not proper expert testimony.

The general test for admissibility of expert testimony is whether the testimony will aid the trier of fact in understanding the evidence or in determining a fact in issue. Ark. R. Evid. 702 (2011); *Buford*, 368 Ark. 87, 243 S.W.3d 300. An important consideration in determining whether the testimony will aid the trier of fact is whether the situation is beyond the ability of the trier of fact to understand and draw its own conclusions. *Id.*

We agree with the State that, as a medical expert in the field of child abuse, Dr. Esquivel was familiar with how L.B.'s hand injuries would have appeared at the time they were incurred and whether their appearance at that time would have been apparent to a care giver—something the jury could not have determined from the photographs taken of L.B. at ACH because they were taken after the injuries on her hand had begun to heal. Because the challenged expert testimony would thus aid the jury both in understanding the evidence and in determining a fact in issue as to whether Appellant was aware of L.B.'s abuse, the circuit court did not abuse its discretion in allowing the expert testimony.

Additionally, Appellant challenges as irrelevant the testimony of Lois Smith, Appellant's mother, that if she had seen the injury on L.B.'s buttocks, she would have found out what happened. Appellant argues that what actions Smith would have taken were not relevant. Appellant argues further that the jury should have been allowed to draw their own conclusions from the proof as to whether L.B.'s injuries were noticeable and what Appellant should have done about them.

We agree with the State that as Appellant's mother and L.B.'s grandmother, Smith's reaction to L.B.'s injuries was rel-

evant to the issues of whether Appellant knew or "had good reason to know that abuse" of L.B. had occurred, and whether Appellant "recklessly fail[ed] to take action to prevent [L.B.'s] abuse." Ark.Code Ann. § 5–27–221(a). Smith's testimony was cumulative of similar, unchallenged testimony from Appellant's sister, who was also L.B.'s care giver on occasion. Both witnesses testified as to what each one individually would have done had they seen the injury on L.B.'s buttocks, but they did not comment or opine as to what they thought Appellant should have done. Smith's testimony, therefore, did not invade the province of the jury to draw its own conclusions from the evidence with respect to Appellant, and we cannot say the circuit court abused its discretion in permitting Smith's testimony in this regard.

## VI.  *Sex–Offender Registration*

As her sixth and final point on appeal, Appellant argues that the circuit court erred by amending the judgment and requiring her to register as a sex offender pursuant to the Arkansas Sex Offender Registration Act. Appellant bases her argument on the fact that the jury convicted her of permitting abuse of her daughter that caused serious *physical* injury, rather than any kind of *sexual* abuse or injury. Appellant acknowledges that she is raising this argument for the first time on appeal, but contends she may do so because she had no opportunity to object to the amendment of the judgment and because the requirement to register amounts to an illegal sentence.

The original judgment and commitment order was filed on June 28, 2010, and erroneously indicated that Appellant had not been adjudicated guilty of an offense requiring registration as a sex offender. *See* Ark.Code Ann. § 12–12–903(12)(A)(i)(s) (Repl.2009) (stating that permitting abuse of a minor, without any distinction for sexual or physical injury, is one of the crimes expressly designated for sex-offender registration); *see also* Ark. Code Ann. § 5–27–221(b)(1) (Supp.2005) (defining "abuse" for purposes of permitting abuse of a minor as "sexual intercourse, deviate sexual activity, sexual contact, or causing physical injury, serious physical injury, or death"). Appellant filed her notice of appeal on July 28, 2010. The circuit court filed its amended judgment on September 2, 2010, to correctly indicate that Appellant had been adjudicated guilty of an offense requiring registration as a sex offender. *See* Ark.Code Ann. § 12–12–906(a)(1)(A)(i) (Repl.2009) (mandating that the sentencing court "shall enter on the judgment and commitment or judgment and disposition form that the offender is required to register as a sex offender"). The circuit court amended its judgment prior to the time the appeal transcript was lodged in this court.

We reject Appellant's contention that she had no opportunity to object to the amended judgment. The record before us simply does not support that assertion. Appellant presents an issue requiring the interpretation and interplay of our criminal statutes on sex-offender registration and permitting abuse of a minor. No explanation is offered for Appellant's failure to raise the statutory-interpretation issue to the circuit court by way of a postjudgment motion after the amendment. This is a direct appeal following a criminal conviction, and as such our jurisdiction is appellate only, which means that we have jurisdiction to review a decision, order, or decree of an inferior court, but not to decide issues that were not decided first by the inferior court. *Webb v. State,* 2012 Ark. 64, 2012 WL 503885 (citing *Gwin v. Daniels,* 357 Ark. 623, 184 S.W.3d 28 (2004)). Because Appellant did not ask the circuit court to interpret the sex-of-

fender registry so as to distinguish between permitting child abuse with physical injury and permitting child abuse with sexual injury, there is nothing for this court to review on appeal. This court cannot and will not decide this issue of statutory interpretation for the first time on appeal. *See id.* The present case does not involve a circuit court's sua sponte remand to district court and deprivation of Appellant's statutory right to trial by jury in circuit court, and therefore Appellant's reliance on *Harrell v. City of Conway,* 296 Ark. 247, 753 S.W.2d 542 (1988), is misplaced as applicable authority for addressing her statutory-interpretation argument for the first time on appeal.

■ We likewise reject Appellant's assertion that we may address her argument for the first time on appeal because it involves an illegal sentence. It is well settled that an appellant may challenge an illegal sentence for the first time on appeal, even if she did not raise the argument below. *Richie v. State,* 2009 Ark. 602, 357 S.W.3d 909. However, this is not an illegal sentence, as this court has held that the registration and notification requirements of the Arkansas Sex Offender Registration Act are "essentially regulatory and therefore non-punitive in nature." *Kellar v. Fayetteville Police Dep't,* 339 Ark. 274, 287, 5 S.W.3d 402, 410 (1999). Sex-offender registration is "not a form of punishment," *id.,* and is therefore not a criminal sentence, be it illegal or otherwise.

Appellant was convicted of an offense that requires her registration as a sex offender. The record simply does not bear out her assertion that she had no opportunity to object to the amendment of the judgment. Moreover, the requirement to register as a sex offender is not a sentence, be it illegal or otherwise. Accordingly, Appellant's statutory-interpretation argument is not preserved for our review on appeal.

For the aforementioned reasons, we find no merit to Appellant's previous points for reversal and affirm the judgment of convictions.

BROWN, J., concurs.

ROBERT L. BROWN, Justice, concurring.

I agree with the majority that this case should be affirmed. I write separately to express my concern that our Sex Offender Registration Act requires a person who has been convicted of permitting the physical, but not sexual, abuse of a minor to register as a sex offender.

The Sex Offender Registration Act requires any person who has been "adjudicated guilty on or after August 1, 1997, of a sex offense" to register as a sex offender. Ark.Code Ann. § 12–12–905(a)(1) (Repl. 2009). The Act also mandates that the sentencing court "enter on the judgment and commitment or judgment and disposition form that the offender is required to register as a sex offender." Ark.Code Ann. § 12–12–906(a)(1)(A)(i) (Repl.2009). Under Arkansas Code Annotated section 12–12–903(12)(A)(i)(s) (Repl.2009), "sex offense" includes, but is not limited to, permitting the abuse of a minor pursuant to Arkansas Code Annotated section 5–27–221. A person commits the offense of permitting the abuse of a minor if, being a parent, guardian, or person legally charged with the care or custody of a minor, he or she recklessly fails to take action to prevent the abuse of a minor. Ark.Code Ann. § 5–27–221(a) (Supp.2005). Abuse, as used in section 5–27–221, "means only sexual intercourse, deviate sexual activity, sexual contact, or causing physical injury, serious physical injury, or death, which could be prosecuted as a de-

linquent or criminal act." Ark.Code Ann. § 5–27–221(d)(1) (Repl.2006).

Although the circuit court was required to order Sullivan to register as a sex offender based on her conviction of permitting the abuse of a minor, it concerns me that a person who has been convicted of permitting the physical abuse, not sexual abuse, under that statute, is required to register as a sex offender. Is that truly the intent of the General Assembly? The General Assembly should examine our Sex Offender Registration Act to determine whether that result is appropriate, and in line with what it intended.